IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

ALFONZO LEWIS,

                Defendant.

CRIMINAL CASE NO.

1:18-CR-00369-WMR-JFK

## ORDER and REPORT AND RECOMMENDATION

Pending before the court is Defendant Alfonzo Lewis' motion [Doc. 19] and amended motion [Doc. 25] to suppress evidence, a quantity of cocaine, obtained during the search of a vehicle in which he was a passenger; the search was the result of a warrantless traffic stop. Also pending before the court is Defendant's motion [Doc. 20] to suppress statements made at the scene of the traffic stop and subsequently at the Fulton County jail. Finally, Defendant filed a corrected motion [Doc. 28] for a bill of particulars. An evidentiary hearing was held on May 21, 2019, on Defendant's motions to suppress.[1] [Doc. 35]. The court will first address the motions to suppress evidence and Defendant's statements.

---

[1]Citations to the transcript of the hearing are:  (Tr. at ).

## I.    Motions to Suppress

In his post-hearing brief in support of the motions to suppress evidence, Defendant contends that the Government has failed to establish either probable cause or reasonable suspicion for the traffic stop and failed to establish probable cause to support the warrantless search of the vehicle in which he was a passenger.  [Doc. 42 at 7-10].  Defendant also contends, with respect to his motion to suppress statements, that he was not advised of his Miranda[2] rights before he was subjected to custodial interrogation, either during the traffic stop or later at the jail, that his first statement claiming ownership of a bag was not spontaneous and that his statements were the result of an unlawful detention and arrest.  [Id. at 10-14].  Finally, Defendant argues that, pursuant to the doctrine of collateral estoppel or issue preclusion, the Government is barred from using the evidence seized during the traffic stop.  [Id. at 15-23].  In response, the Government opposes the motions to suppress contending that both probable cause that a traffic offense was committed or a reasonable suspicion that the occupants of the vehicle were engaged in criminal conduct justified the traffic stop, that the events during the traffic stop provided probable cause for a search of the vehicle, that Defendant did make a spontaneous admission and that, otherwise, he was

_____

[2]See Miranda v. Arizona, 86 S. Ct. 1602, 1630 (1966).

advised of and waived his <u>Miranda</u> rights and that the Government is not precluded from using the evidence based on the doctrine of collateral estoppel. [Doc. 51]. Defendant filed a reply brief that does not materially add to the arguments of the parties. After consideration of the arguments, record before the court and relevant legal authorities, the court finds that Defendant's motions to suppress are due to be denied.

### a.    Background Facts

In August of 2015, members of the High Intensity Drug Trafficking Area ("HIDTA") group were conducting an investigation of suspected drug traffickers. (Tr. at 4-5). HIDTA Task Force Officer ("TFO") Michael Hannan is the case agent for the investigation.[3] (<u>Id.</u> at 5-6). On August 20, 2015, while at his office, TFO Hannan was monitoring a surveillance camera set up to observe the driveway and/or front of the residence located at 2105 Rexford Drive, Decatur, Georgia ("Rexford"); the residence had been identified as belonging to the drug trafficking organization under investigation. (<u>Id.</u> at 5-6). The TFO observed a black Dodge Charger arrive and park

---

[3]TFO Hannan has been a law enforcement officer for twenty-seven years, including seventeen years investigating narcotic traffickers with HIDTA. (<u>Id.</u> at 4-5). For the last ten years, he has been employed by the Fulton County Sheriff's Office ("FCSO") on detail to HIDTA. (<u>Id.</u>).

3

in the driveway of the residence, and he observed a black male (shorter, stocky-ish in build) exit from the passenger side of Charger, retrieve a brown bag from the vehicle's trunk and walk towards the front of the residence. The Charger then left.[4]  (Id. at 6, 42). Based on the Charger's tag, the registered owner was Shanecee Peterson, Albany, Georgia.  (Id. at 6).  After approximately an hour, the Charger returned to the residence, and the female driver exited and reentered the front passenger side of the vehicle.  The same black male previously observed exiting the Charger, along with another black male, approached the Charger; the previously observed black male placed the same brown bag into the vehicle's trunk and entered the back passenger seat while the other black male entered the driver's seat.  The vehicle then left.  (Id. at 7-8).

As a part of the investigation of the Rexford residence, on August 25, 2015, an undercover officer purchased two kilograms of methamphetamine for $24,000.  (Id. at 10).  The  undercover officer was provided with a silver F150 truck with a secret compartment (trap) in which the methamphetamine was placed.  While the F150 truck was in the Government's possession, a tracking device was placed on the vehicle to allow the vehicle to be tracked after it was returned to members of the drug trafficking

_____

[4]This was on the only occasion that TFO Henry recalled observing the Charger at the Rexford residence.  (Tr. at 28, 32).

AO 72A
(Rev.8/82)

organization at the Rexford residence.  (Id. at 10-11).  And on September 11, 2015, a traffic stop was conducted of a vehicle which had been observed at the Rexford residence; the investigating agents believed the occupants were drug customers.  As a result of the stop, a pound of crystal methamphetamine was seized.  (Tr. at 41-42).  Also, on October 22, 2015, a vehicle arrived at the residence occupied by a male and a female.  On this occasion, they left in another vehicle - activity previously observed during the undercover purchase - which was subsequently stopped and a pound and one-half of crystal methamphetamine was found in a second compartment in the vehicle.  (Tr. at 42).

As a result of tracking the silver F150 truck, in October 2015, investigating officers identified the residence located at 1398 McClelland Avenue, East Point, Georgia ("McClelland"), as another location used by the drug trafficking organization. (Tr. at 11-12).  As a part of the investigation, a surveillance camera was set up at this residence in order to view the driveway and/or front of the residence.  (Tr. at 12-13). On December 14, 2015, at approximately 2:30 p.m., TFO Hannan was monitoring the camera from his office and observed a black Suburban arrive and park in the driveway. (Tr. at 13, 16).  He observed two black males exit the vehicle; the passenger's physical appearance being similar to that of the black male observed on August 20, 2015, at the

Rexford residence.[5]  (Tr. at 13, 43).  The registered owner of the Suburban was Shanecee Peterson, Albany, Georgia, the same as the Dodge Charger observed at the Rexford residence.  (Tr. at 14).  Defendant Lewis retrieved a brown bag from the back passenger seat of the vehicle, and both men walked towards the front of the residence. (Tr. at 13).  Based on his experience and the events he was observing, TFO Hannan "felt that there was a high chance that this was going to be a customer picking up some narcotics," accordingly he made contact with Lieutenant Corey Henry ("Lt. Henry"), FCSO, to determine if Lt. Henry was available to conduct a traffic stop.[6]  (Tr. at 14). TFO Hannan advised Lt. Henry that he was watching a residence and that "there was a chance that there was going to be a vehicle leaving that would probably have a quantity of narcotics in it" and asked that, if available, "could you obtain probable

---

[5]During the subsequent traffic stop, this individual was identified as Defendant Lewis and will be referred to by his name in continuing to set forth the facts.  (Tr. at 34-35, 61).

[6]Lt. Henry has been in law enforcement for twenty-one years and, at the time of the evidentiary hearing, was a FCSO commander for the K-9, criminal investigations, civil process, GCIC and sex offender units.  (Tr. at 50-51).  He is also a member of FCSO's SWAT.  (Tr. at 51).  At the time of the events in December 2015, he was a sergeant and in the K-9 unit.  He was not part of HIDTA or any other federal task force.  (Tr. at 14-15).

cause through a traffic violation and make a traffic stop on the vehicle . . . ."[7]  (Tr. at 15, 37, 68, 90-91).  The TFO asked Lt. Henry, when he said he was available, to go to and wait at the Lakewood MARTA station which was located near the McClelland residence.  (Tr. at 15-16).  TFO Hannan and other investigators also headed towards the area of the McClelland residence, and the TFO continued to monitor the surveillance camera on his lap top.  (Tr. at 16).

The TFO observed a white Escalade, usually driven by a subject of the investigation, Tyler Owens, drive past the McClelland residence, where he lives.  (Tr. at 17).  Then the TFO observed Warren Ferguson, the main target of the investigation, arrive in a white Volvo and park behind a white F150 truck; he exited and walked towards the residence.  (Tr. at 17).  Shortly thereafter, Owens and Ferguson walked into view, both carrying black/dark-colored bags.  After Ferguson moved the Volvo from behind the truck and parked it behind the Suburban, both entered the F150 and left.  (Tr. at 17-18).  The men returned in the F150, and entered the residence.  A few minutes later, Ferguson left in the white Volvo.  (Tr. at 18).  Less than an hour later, Owens retrieved a dark-colored bag from the F150 and headed back towards the

---

[7]Lt. Henry testified that he understood that he was "asked[,] if PC developed, to conduct a traffic stop of the vehicle."  (Tr. at 52, 83-84).

residence. (Tr. at 18). Surveillance agents later observed an Escalade drive past them but were unable to identify if Owens was driving; however, twenty minutes later, the Escalade driven by Owens arrived at the residence and parked on the driveway, and he exited and entered the residence. (Tr. at 18). Approximately ten to fifteen minutes later, Defendant Lewis and the second black male are seen walking towards the Suburban. (Tr. at 18-19). The black male entered the driver's seat, and Defendant Lewis, after placing the brown bag in the back seat of the vehicle, entered the front passenger seat; the vehicle departed. (Tr. at 19). Based on this conduct and the investigation, TFO Hannan "believed that these were customers that were showing up to pick up whatever quantity of some narcotic from this organization." Although TFO could not be "sure" that the vehicle contained narcotics, he formed that opinion based on his investigation - including the similarity in conduct at the Rexford and McClelland residences - and seventeen years "working drug investigations."[8] (Tr. at 19; 37-38).

TFO Hannan advised Lt. Henry that the Suburban, providing a description and tag number and with at least two black male occupants, was leaving the residence and

---

[8]The TFO acknowledged that there had been no arrests associated with the residence and no drug buys from the residence. (Tr. at 35).

8

the direction of travel. The Suburban was followed as it eventually headed southbound on I-85. (Tr. at 20-22; 54-55). Lt. Henry, in his marked patrol vehicle,[9] testified that as he initially followed the Suburban, at approximately 5:30 p.m., there was moderate rush hour traffic which thinned out as they traveled further south past Old National Highway/Spur 14. (Tr. at 54-55). The speed limit was seventy miles per hour. (Tr. at 55). Following the Suburban for approximately three miles and using his calibrated speedometer, Lt. Henry determined that the Suburban was traveling at a rate of eighty-three miles per hour.[10] (Tr. at 55-56, 70). He did not immediately conduct the traffic stop, but slowed down allowing other vehicles to get between him and the Suburban, because he was waiting for Georgia State Patrol Trooper ("Trooper") Jordan Ennis to

---

[9]The patrol vehicle was not equipped with a camera or audio equipment. He also did not have a body camera. (Tr. at 53). With him were his K-9, Kojak, and FCSO Deputy Bryon Thomas; neither had body cameras. (Id.). Kojak is a full service K-9, trained to detect illegal narcotics and for tracking. (Tr. at 61).

[10]On cross-examination, Lt. Henry was questioned about the reason he stopped the Suburban and the fact that, at a prior state hearing concerning the traffic stop, he had not testified about the request made by TFO Hannan. (Tr. at 69-70, 80-84). Lt. Henry repeatedly stated that he conducted the traffic stop because the Suburban was speeding. He did not stop the Suburban because of his conversation with TFO Hannan. (Tr. at 70, 80-84). His attention was placed on the Suburban because of the TFO's request that he follow the vehicle. (Tr. at 84).

arrive in order to assist with the traffic stop.[11]  (Tr. at 56, 94, 98).  When Lt. Henry saw Trooper Ennis approaching in his rear view mirror, he activated his siren and blue lights to the conduct the traffic stop and caught back up with the Suburban which was traveling in the left lane.[12]  (Tr. at 57).  The traffic stop began at approximately 5:40 p.m. (Tr. at 88).  Trooper Ennis also activated his blue lights and siren.[13]  (Tr. at 97).

The Suburban initially stopped in the left hand travel lane with both police vehicles stopping behind the vehicle; at the direction of Lt. Henry, the Suburban moved over to the right side shoulder of the highway.  (Tr. at 57-58, 97).  The only officers at the scene were Lt. Henry, Deputy Thomas and Trooper Ennis.  The Trooper remained in his patrol vehicle until the passengers of the Suburban exited.  (Tr. at 58,

---

[11]Lt. Henry had contacted Trooper Ennis to be present in case the occupants of the Suburban did not stop but fled.  Lt. Henry cannot pursue a fleeing vehicle; however, Troopers may do so.  (Tr. at 56).

[12]Trooper Ennis did not recall exactly where southbound on I-85 he caught up with Lt. Henry or how long he followed Lt. Henry before the traffic stop was conducted. (Tr. at 102-03).  He did not observe any traffic violations; however, he was not looking for violations and is not sure of the speed he was traveling.  (Tr. at 104).

[13]The Trooper's marked vehicle was equipped with video and audio recorders.  The video, pointed out the front of the windshield, always records but the audio starts when lights and siren are activated.  (Tr. at 95-96).  The Trooper also had a body microphone but no body camera.  (Tr. at 96).  And he was accompanied by his K-9, Tek.  (Tr. at 96).  The Trooper did not deploy Tek during the traffic stop.  (Tr. at 100-01, 111).

99, 106). All of the officers were in uniform and had firearms. (Tr. at 86). Lt. Henry and Deputy Thomas exited the patrol vehicle, with Lt. Henry approaching the driver side and the Deputy approaching the passenger side of the Suburban. (Tr. at 58-59, 73). The driver's side window was down, and Lt. Henry spoke with the driver whom he identified as Telrone Houston and advised why the Suburban had been stopped.[14] (Tr. at 59). As he spoke to the driver, Lt. Henry detected the smell of burnt marijuana.[15] (Tr. at 59-60, 74-75). He requested and received Houston's driver's license and then returned to the patrol vehicle to conduct a license check and start the traffic citation. (Tr. at 59-60, 75). Before completing the citation, Lt. Henry went back to the Suburban and asked Houston to exit and to walk to the rear of the Suburban in order to speak to him, leaving Defendant Lewis in the vehicle. (Tr. at 60, 76-77).

Because he had detected the odor of burnt marijuana, Lt. Henry asked Houston if there was marijuana in the Suburban, and Houston responded, no, but that he had smoked marijuana earlier that day. (Tr. at 60, 78). Lt. Henry advised Houston that a

---

[14]Although Trooper Ennis observed Lt. Henry speaking with Houston, he did not overhear the conversation. (Tr. at 99).

[15]Trooper Ennis never approached the Suburban and did not detect the odor of marijuana; however, he heard Lt. Henry state that he smelled the odor of burnt marijuana. (Tr. at 99-100, 106-07).

11

probable cause search of the Suburban would be conducted, and Defendant Lewis was also removed from the vehicle.[16]  (Tr. at 61, 78).  Deputy Thomas and Trooper Ennis stood with the men.  (Tr. at 105-06).  Less than an half hour after the start of the stop, Lt. Henry conducted the search of the Suburban and located a brown bag on the back passenger seat floorboard, which he picked up and opened finding five kilogram packages of suspected cocaine.  (Tr. at 62, 85, 92, 100-01).  He left the bag inside the Suburban and returned to his patrol vehicle where he advised Deputy Thomas and Trooper Ennis to detain Houston and Defendant Lewis.[17]  Both men were handcuffed but remained standing outside of the vehicles.  No weapons were drawn.  Neither man was advised that he was under arrest.  (Tr. at 62-64, 85-86, 108).  Lt. Henry returned to the Suburban and retrieved the brown bag, carrying it to his patrol vehicle in his right hand.  (Tr. at 63, 86, 109).  Defendant Lewis stated that the bag was his.  (Tr. at 63, 87).  Lt. Henry placed the bag on the hood of his patrol vehicle and returned to

---

[16]Lt. Henry did not deploy his K-9 or use his K-9 to conduct an open air examination of the Suburban because he had already detected the odor of marijuana and had probable cause for the search and because of the threat to Kojak's safety on the side of the highway from passing traffic.  In fact, a passing vehicle hit one of the patrol vehicles on scene that day.  (Tr. at 62, 75).

[17]Trooper Ennis estimated that Houston and Defendant were detained approximately ten to twenty minutes after the stop commenced.  (Tr. at 110).

AO 72A
(Rev.8/82)

complete the search of the Suburban, not locating any further contraband, including no burnt marijuana.  (Tr. at 63, 87-88).

Lt. Henry then contacted TFO Hannan to advise him about the discovery of the cocaine and to advise him that Defendant Lewis had claimed the bag but also advised that the traffic stop had not yet been completed.  (Tr. at 23, 63).  The TFO advised Lt. Henry to allow the driver, Houston, to leave but to place Defendant Lewis under arrest.  (Tr. at 23, 64).   TFO Hannan advised Defendant that he was under arrest and then advised him of his <u>Miranda</u> rights reading from a screen shot saved on his cellular telephone.  (Tr. at 64).  Defendant was advised that he had the right to remain silent, that anything he said could be used against him in court, that if he could not afford a lawyer, one would be appointed for him by the court and that he had the right to refuse to answer questions and to discontinue questioning at anytime.   (Tr. at 64-65).  Defendant elected to waive his rights, and he prepared a written statement and signed the statement which has the time of 7:03 p.m.  (Tr. at 65-66, 88-89; Gov't Exhibit 3).  At the bottom of the statement, above Defendant's signature, is the following typed statement:  "I certify that I have made the above statement of my own free will and without duress.  I fully understand that I am not required to make a statement and by making this statement, I do so understanding it can be used in court as evidence.  I am

13

aware that there are criminal penalties, up to and including prosecution, if this statement is made to deceive or obstruct the due process of law." (Tr. at 65-66; Gov't Exhibit 3). Defendant was then placed into a patrol vehicle for transport to the Fulton County jail.[18] (Tr. at 66). Before Defendant was transported, Lt. Henry called TFO Hannan again to advise that Defendant had requested to speak to law enforcement about information he had in order to help himself. (Tr. at 24, 67). The traffic stop was cleared at 8:30 p.m., that is, the last officer left the scene; however, Defendant had departed for the jail before that time. (Tr. at 91-92).

TFO Hannan and TFO Matthew Dembowski met with Defendant Lewis at the sally port for the Fulton County jail later on the same day. (Tr. at 24-25). They sat on a bench outside the door to the jail. (Tr. at 25). In order to protect from disclosure of the drug investigation, TFO Hannan identified himself as an investigator with the FCSO. (Tr. at 25-26). TFO Dembowski provided TFO Hannan with a Miranda rights card in order to read Defendant his rights.[19] (Tr. at 26, 40). Hannan advised Defendant

---

[18]Houston, who did not appear to be under the influence or acting erratically, was eventually sent on his way after a problem with the Suburban was fixed. (Tr. at 66-67, 78-79).

[19]Because the Miranda rights and waiver form that TFO Hannan had was issued by DEA, noting DEA on the form, he did not use it. (Tr. at 26, 40).

14

that he had the right to remain silent, that anything he said could be used against him in a court of law, that he had the right to have an attorney with him during questioning, and that, if he could not afford an attorney, one would be appointed for him.[20]   (Tr. at 27).   Defendant stated that he understood his rights and that he wished to make a statement.  (Tr. at 27).  TFO Hannan said that neither officer was armed (because of being at the jail), that Defendant remained handcuffed, that Defendant never asked to stop the interview and that Defendant did not appear to be under the influence of drugs or alcohol.  (Tr. at 45-47).  The TFO did not threaten Defendant or make him any promises.   (Tr. at 48).   He was confident that Defendant understood what was happening.  (Tr. at 47).  However, he did not ask Defendant about his educational background or whether he could read or write English.  (Tr. at 49).

The Fulton County District Attorney initially prosecuted Defendant Lewis on drug charges based on the seizure of cocaine on December 14, 2015.  Defendant moved to suppress the evidence, and the Superior Court Judge initially and on

---

[20]TFO Hannan, on cross-examination, stated that he could not testify that the rights he stated were verbatim from the card but that all cards "say essentially the same thing, the Miranda rights and the waiver."  (Tr. at 40-41).  On redirect, the TFO testified that he was sure that he advised Defendant of his right to remain silent, right against self-incrimination, right to counsel and right to discontinue questioning.  (Tr. at 43).

reconsideration denied the motion to suppress.  [Doc. 42, Exhibit A ("Order")].  On a second motion for reconsideration, the judge entered an order granting the motion to reconsider and Defendant's motion to suppress.  [Id.].  The additional evidence considered by the Superior Court Judge was a DEA report detailing the surveillance of the residence on December 14, 2015, and Lt. Henry being contacted by an agent and "instructed [to] follow the vehicle carrying Defendant as a passenger and 'to conduct a traffic stop of a suspected drug trafficker if a traffic violation is observed.'"  [Id.]. The judge noted that the Deputy did not inform the court "that the traffic stop was made pursuant to instructions from an HIDTA agent."  [Id.].  The judge stated, "Implicit in this instruction was that Deputy Henry was to conduct a search of the vehicle once he stopped it."  [Id.].  Also, in evidence before the Superior Court Judge, was testimony by the driver, Houston, who denied speeding and information that the speeding ticket was subsequently dismissed.  [Id.].  The Superior Court Judge also opined that based on the video from Trooper Ennis' vehicle, it did not appear that either the Deputy's or the Defendant's vehicle was traveling as fast as 83 miles per hour. [Id.].  Houston also denied ever telling the Deputy that he had smoked marijuana that day.  [Id.]. The judge also noted that Houston had denied smoking marijuana in the vehicle or that there was marijuana in the vehicle and that the Deputy did not

16

deploy his K-9 to conduct a "drug sniff." [Id.]. Based on the evidence, the Superior Court Judge said, "The only conclusion the Court can draw after reading the DEA report is that Deputy [Henry] never smelled burning marijuana. He simply wanted an excuse to search the car. More specifically, he wanted to inspect the 'brown bag' and its contents." [Id.]. The judge concluded, "It thus appears that the traffic stop may well have been entirely pre-textual and that Houston was not speeding at the time he was pulled over." [Id.]. The judge granted the motion to dismiss. [Id.]. And the Superior Court Judge subsequently dismissed the state charges on November 1, 2017. [Doc. 42, Exhibit 2 ("Dismissal Order")]. There is no other evidence in the record regarding the bringing of or dismissal of the state drug charges or the suppression hearing conducted in Superior Court. Defendant Lewis was indicted by a federal grand jury in the Northern District of Georgia on September 18, 2018. [Doc. 1].

Additional facts will be set forth as necessary in discussion of the motions to suppress.

### b.    Discussion

Defendant seeks to suppress the quantity of cocaine seized from the Suburban, the statements that he made during the traffic stop, both before and after being advised of his Miranda rights, claiming ownership of the bag containing the drugs and the

17

statement that he made at the Fulton County Jail after being advised of his rights. Defendant's challenge focuses in large part on the credibility of Lt. Henry and, to a lesser degree, of TFO Hannan.  [Doc. 42].

### 1.     Credibility of Witnesses

Although the court will address *infra* specific arguments regarding witness credibility, the following generally guides the court's consideration of Defendant's arguments.  "Credibility determinations are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses."  United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002).  In weighing the credibility of a witness, the court takes "into account the interests of the witnesses, the consistencies or inconsistencies in their testimonies, and their demeanor on the stand."  Id. at 750; see also United States v. Wein, 2006 WL 2128155, at *3 (W.D. Pa. July 27, 2006) (noting that "customary techniques to ascertain the credibility of the witnesses" included, but was "not limited to: appearance and conduct of each witness, the manner in which he testified, the character of the testimony given, his intelligence, motive, state of mind, and demeanor while on the stand").  And, unless the evidence "'is contrary to the laws of nature, or is so inconsistent or improbable on its face that no

18

reasonable factfinder could accept it" or unless the factfinder's determinations appear to be "'unbelievable[,]'" a reviewing court should accept those findings of fact. Ramirez-Chilel, 289 F.3d at 749 (citations omitted); accord United States v. Griffith, 397 Fed. Appx. 613, 617-18 (11ᵗʰ Cir. 2010).  Having observed Lt. Henry's and TFO's Hannan's testimony and considering the totality of the circumstances, including that no other witness directly disputed the testimony of either witness and that the testimony of each witness was internally consistent, and for the reasons further stated *infra*, the court finds the officers' recollections of the events on December 14, 2015, are credible.

### 2.      Traffic Stop, Detention/Arrest and Search

"A traffic stop, which 'is a seizure within the meaning of the Fourth Amendment,' . . . 'is constitutional if it is either based upon probable cause to believe a traffic violation has occurred or justified by reasonable suspicion in accordance with Terry[v. Ohio, 88 S. Ct. 1868 (1968)].'"  United States v. Spoerke, 568 F.3d 1236, 1248 (11ᵗʰ Cir. 2009) (citations omitted); United States v. Dixon, 491 Fed. Appx. 120, 122 (11ᵗʰ Cir. 2012) (same).  As the Eleventh Circuit Court of Appeals stated in United States v. Cooper, 133 F.3d 1394 (11ᵗʰ Cir. 1998), "law enforcement 'may stop a vehicle when there is probable cause to believe that the driver is violating any one of the

19

multitude of applicable traffic and equipment regulations relating to the operation of motor vehicles.'" Id. at 1398 (quoting United States v. Strickland, 902 F.2d 937, 940 (11th Cir. 1990)); see also United States v. Terry, 220 Fed. Appx. 961, 963 (11th Cir. 2007) (same).  Additionally, "[l]aw enforcement officers may make an investigative stop of a vehicle if they have a reasonable suspicion the occupants of the vehicle are engaged in criminal conduct" United States v. Durrah, 384 Fed. Appx. 970, 971 (11th Cir. 2010) (citing United States v. Lopez-Garcia, 565 F.3d 1306, 1313 (11th Cir. 2009) ("It is by now well established that a 'law enforcement officer may conduct a brief investigative stop of a vehicle, analogous to a Terry-stop, if the seizure is justified by specific articulable facts sufficient to give rise to a reasonable suspicion of criminal conduct.'") (citation omitted)).[21]  Furthermore, pursuant to the decision in Brendlin v. California, 127 S. Ct. 2400 (2007), a passenger in a vehicle, such as Defendant Lewis, has only a limited challenge to a warrantless vehicle stop and search of his person.  In Brendlin, the Supreme Court held that a passenger in an automobile, stopped as the result of either a traffic offense or based on reasonable suspicion of criminal activity, is seized the same as the driver and may challenge the constitutionality of the stop.

---

[21]See Terry v. Ohio, 88 S. Ct. 1868 (1968).

20

127 S. Ct. at 2406-08, 2410.[22]  Thus, a passenger may challenge the recovery of any evidence off his person or statements made as a result of the stop.[23]

The court will first address whether there was probable cause to conduct the traffic stop of the Suburban for speeding.  It is important to note that, "[w]hen determining whether an officer had probable cause to believe that a traffic violation occurred, the 'officer's motive in making the traffic stop does not invalidate what is

---

[22]For this reason, law enforcement officers are not required to present individualized articulable suspicion for each occupant of a vehicle; the initial detention of all occupants "is justified by the fact that [the defendant] was a passenger in a vehicle lawfully detained under Terry." United States v. Durrah, 2009 WL 10688822, at *6 & n.5 (N.D. Ga. July 8, 2009).

[23]Therefore, absent additional evidence, Defendant Lewis has not established a legitimate expectation of privacy in the actual search of the Suburban or the seizure of any evidence from the Suburban, including the brown bag containing the cocaine.  To determine whether an individual may challenge a search, the court must decide "whether the individual maintains a legitimate expectation of privacy in the object of the search." United States v. Hastamorir, 881 F.2d 1551, 1559 (11th Cir. 1989).  It is a defendant's burden to prove that he had a legitimate expectation of privacy in the place to be searched, such as a vehicle. See United States v. Cooper, 203 F.3d 1279, 1283-84 (11th Cir. 2000).  Making this determination involves a two-part inquiry: (1) "whether the individual has manifested 'a subjective expectation of privacy in the object of the challenged search[,]' . . . [and (2)] whether society is willing to recognize the individual's expectation of privacy as legitimate." Hastamorir, 881 F.2d at 1559 (citation omitted).  However, because the Government did not challenge Defendant's expectation of privacy in this case, the court will not further address this issue.

21

otherwise objectively justifiable behavior under the Fourth Amendment.'"[24] <u>United States v. Harris</u>, 526 F.3d 1334, 1337 (11th Cir. 2008) (citation omitted); <u>see also United States v. Artiles-Martin</u>, 2008 WL 2600787, at *5 (M.D. Fla. June 30, 2008) (the defendant's contention that traffic stop was pretext to conduct search of tractor-trailer foreclosed by <u>Whren</u>).  Lt. Henry had probable cause to stop the Suburban for the traffic infraction of speeding.  The Georgia Code section relevant to the traffic stop provides in pertinent part:

> (a)  The limits specified in this Code section or established as authorized in this article shall be the maximum lawful vehicle speeds. . . .
>
> (b)  Consistent with the provision of engineering and traffic investigations regarding maximum speed limit as provided in Code Section 40-6-182, no person shall drive a vehicle at a speed in excess of the following maximum limits: . . .

---

[24]The law is well established that "'[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.'"  <u>United States v. Jones</u>, 377 F.3d 1313, 1314 (11th Cir. 2004) (quoting <u>Whren v. United States</u>, 116 S. Ct. 1769, 1774 (1996)); <u>see also</u> <u>United States v. McGough</u>, 412 F.3d 1232, 1239 (11th Cir. 2005) (indicating that the magistrate judge had improperly discussed the officers' motives for entering the apartment in resolving the case, the appellate court noted that the test "is an objective one"); <u>United States v. Hernandez</u>, 418 F.3d 1206, 1209 n.4 (11th Cir. 2005) ("[a]n officer's 'subjective intentions' are not relevant for Fourth Amendment analysis").  Although not explicitly argued by Defendant, to the extent his questions during the hearing and discussion in his brief focuses on how Lt. Henry's attention was drawn to the Suburban might be read to argue pretext, those arguments are rejected.

>   (2)   Seventy miles per hour on a highway on the federal
>         interstate system . . . provided that such speed limit is
>         designated by appropriate signs.

O.C.G.A. 40-6-181.  The undisputed evidence establishes that on December 14, 2015,

after TFO Hannan advised Lt. Henry that the Suburban, providing a description and

tag number and with at least two black male occupants, was leaving the McClelland

residence and the direction of travel, Lt. Henry began following the Suburban as it

eventually headed southbound on I-85.  (Tr. at 20-22; 54-55).  Lt. Henry, in his marked

patrol vehicle, testified that as he initially followed the Suburban, at approximately

5:30 p.m., there was moderate rush hour traffic which thinned out as they traveled

further south past Old National Highway/Spur 14.  (Tr. at 54-55).  The speed limit was

seventy miles per hour.  (Tr. at 55).  Following the Suburban for approximately three

miles and using his calibrated speedometer, Lt. Henry determined that the Suburban

was traveling at a rate of eighty-three miles per hour.  (Tr. at 55-56, 70).  The officer's

observations provided probable cause to conduct the traffic stop for speeding.

Disharoon v. State, 263 Ga. App. 787, 789, 589 S.E.2d 339, 342 (2003) ("Because the

officer personally observed Disharoon committing a traffic offense, namely speeding,

he had probable cause to stop her car."); Jones v. State, 258 Ga. App. 337, 338, 574

AO 72A
(Rev.8/82)

S.E.2d 398, 400 (2002) ("[T]o be guilty of speeding, one need only exceed the designated speed limit.").

Defendant argues that Lt. Henry lacked probable cause because his observations were not corroborated and because Trooper Ennis' patrol camera video arguably does not show the Suburban speeding. [Doc. 42 at 9]. "Just because no other witnesses testified that they, too, witnessed Defendant's traffic violation does not make [the officer's] testimony unbelievable." United States v. Williams, 2017 WL 7411024, at *5 (S.D. Fla. January 27, 2017) (citing United States v. Johnson, 641 Fed. Appx. 875, 876 (11th Cir. 2016) ("The jury was entitled to believe the officer's testimony and, because the officer's testimony was not 'incredible as a matter of law,' [the court is] bound by the jury's credibility determination.")).  And, based on the evidence presented at the hearing, there is no reason to conclude that Trooper Ennis - with his video camera activated - was positioned to observe the Suburban as Lt. Henry paced the vehicle traveling eighty-three miles per hour.  When Lt. Henry observed the Suburban speeding, he did not immediately conduct the traffic stop, but slowed down allowing other vehicles to get between him and the Suburban, because he was waiting for Trooper Ennis to arrive in order to assist with the traffic stop.  (Tr. at 56, 94, 98).  When Lt. Henry saw Trooper Ennis approaching in his rear view mirror, he activated

24

his siren and blue lights to the conduct the traffic stop and caught back up with the Suburban which was traveling in the left lane.  (Tr. at 57).  Trooper Ennis did not recall exactly where southbound on I-85 he caught up with Lt. Henry or how long he followed Lt. Henry before the traffic stop was conducted.  (Tr. at 102-03).  The Trooper did not observe any traffic violations; however, he was not looking for violations and is not sure of the speed he was traveling.  (Tr. at 104).  Trooper Ennis also activated his blue lights and siren.[25]  (Tr. at 97).  This evidence does not undermine Lt. Henry's testimony that he observed the traffic violation.  See Hall v. State, 306 Ga. App. 484, 485-86, 702 S.E.2d 483, 485-86 (2010) (the Georgia Court of Appeals rejected a similar argument, that is, that the video recording of the traffic stop did not capture the traffic violation and undermined the officer's testimony and held that "[b]ased on the officer's testimony that his dashboard camera began to record after the truck that [the defendant] had been following too closely had exited, and based on [the court's] review of the recording, [the court] conclude[d] that the video recording of the traffic stop [did] not establish as a matter of law that the officer did not observe" a traffic violation and that "the trial court was authorized to find that the

---

[25]The Trooper's marked vehicle was equipped with video and audio recorders. The video, pointed out the front of the windshield, always records but the audio starts when lights and siren are activated.  (Tr. at 95-96).

officer observed the violation . . .") (citing <u>Proctor v. State</u>, 298 Ga. App. 388, 390(1), 680 S.E.2d 493, 495 (2009)).   The Suburban was lawfully stopped for a traffic violation.

The facts also support a finding that the investigating officers had a reasonable suspicion that the occupants of the Suburban were engaged in criminal activity.[26] Law enforcement officers may briefly detain the individuals found in a vehicle for purposes of investigating a crime if they have a reasonable, articulable suspicion based on objective facts that individuals in the vehicle have engaged in, or are about to engage

---

[26]The facts that form a part of the collective knowledge relied upon to establish a reasonable suspicion to detain Defendant is not limited to observations relayed in detail to Lt. Henry by other law enforcement personnel involved in the investigation or to observations the officer personally made during the traffic stop.  In <u>United States v. Glinton</u>, 154 F.3d 1245 (11th Cir. 1998), the Eleventh Circuit Court of Appeals rejected a defendant's argument that because the officers effecting the stop of the vehicle in which he was riding did not have personal knowledge establishing a reasonable suspicion of criminal activity, the stop was unlawful.  Noting "that reasonable suspicion is determined by the *collective* knowledge of the officers involved in the stop[,]" the court stated, "The fact that the task force officers who ordered the stop by radio had reasonable suspicion to believe [the defendant] was carrying drugs satisfies the <u>Terry</u> requirements for an investigative stop."  <u>Id.</u> at 1257 (emphasis in original).  <u>See, e.g.</u>, <u>United States v. Goddard</u>, 312 F.3d 1360, 1363-64 (11th Cir. 2002) ("Observations and other information supplied by officers involved in a common investigation can, taken together, create probable cause for a search."); <u>United States v. Kapperman</u>, 764 F.2d 786, 791 n.5 (11th Cir. 1985) (although the officer effecting the stop "may not have known all of the facts already uncovered in the investigation[,]" he "was entitled to act on the strength of the radio communication directing him to 'stop the vehicle and secure the scene'").

26

in, criminal activity.  See United States v. Harris, 526 F.3d 1334, 1337 (11th Cir. 2008);

United States v. Lindsey, 482 F.3d 1285, 1290 (11th Cir. 2007).  "[T]he

'reasonableness' standard requires that a police officer 'be able to point to specific and

articulable facts, which, when taken together with rational inferences from those facts,

reasonably warrant that intrusion.'"[27]  United States v. Mikell, 102 F.3d 470, 474-75

(11th Cir. 1996) (citing Terry, 88 S. Ct. at 1880); see also United States v. Blackman,

66 F.3d 1572, 1576 (11th Cir. 1995) ("The reasonableness of the officers' conduct must

be judged against an objective standard:  would the facts available to the officer at the

moment of the seizure or search warrant a man of reasonable caution in the belief that

the action taken was appropriate.") (citations and internal quotation marks omitted)).

"While reasonable suspicion is a less demanding standard than probable cause and

---

[27]And those inferences are considered in light of the training and experience of the law enforcement officers conducting the investigation.  See Lindsey, 482 F.3d at 1290-91 ("We also recognize that the police may 'draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.'") (citation omitted); United States v. Smith, 201 F.3d 1317, 1323 (11th Cir. 2000) ("In deciding whether the detaining officers had reasonable suspicion, we look at the totality of the circumstances known to the detaining officers at the time of the detention[,]" which includes viewing all of the circumstances "in the light of the officers' special training and experience."); United States v. Diaz-Lizaraza, 981 F.2d 1216, 1221 (11th Cir. 1993) ("While none of these actions is criminal on its face, together they did provide the trained agents with reasonable suspicion" that the defendant was involved in criminal activity.).

requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." Lindsey, 482 F.3d at 1290 (quoting Illinois v. Wardlow, 120 S. Ct. 673, 675-76 (2000)) (internal quotation marks omitted); see also Mikell, 102 F.3d at 475. "Also, '[a] reasonable suspicion of criminal activity may be formed by observing exclusively legal activity,' . . . even if such activity is 'seemingly innocuous to the ordinary citizen.'" Lindsey, 482 F.3d at 1290 (citations omitted). Initially the court must determine whether the officer's action in stopping the Suburban and detaining Defendant "was justified at its inception," that is, was there a reasonable suspicion of criminal activity. United States v. Acosta, 363 F.3d 1141, 1144 (11th Cir. 2004) (citations and internal quotation marks omitted).

At the time Lt. Henry effected the traffic stop, investigating officers and agents knew the following information. On August 20, 2015, at the Rexford residence, which had been identified as belonging to a drug trafficking organization, TFO Hannan observed a black Dodge Charger (registered owner Shanecee Peterson, Albany, Georgia) arrive and park in the driveway of the residence, and he observed a black male (shorter, stocky-ish in build) exit from the passenger side of Charger, retrieve a brown bag from the vehicle's trunk and walk towards the front of the residence. The

28

Charger then left.  (Id. at 6, 5-42).  After approximately an hour, the Charger (driven by a female) returned to the residence, and the same black male previously observed exiting the Charger, along with another black male, approached the Charger; the previously observed black male placed the same brown bag into the vehicle's trunk and entered the back passenger seat while the other black male entered the driver's seat which had been vacated by the female.  The vehicle then left.  (Id. at 7-8).  Supporting the officer's opinions about drug trafficking activity taking place at the Rexford residence, on August 25, 2015, an undercover officer purchased two kilograms of methamphetamine for $24,000.  (Id. at 10).  The undercover officer was provided with a silver F150 truck with a secret compartment (trap) in which the methamphetamine was placed.  While the F150 truck was in the Government's possession, a tracking device was placed on the vehicle to allow the vehicle to be tracked after it was returned to members of the drug trafficking organization at the Rexford residence.  (Id. at 10-11).  And on September 11, 2015, and on October 25, 2015, traffic stops were conducted on vehicles which had been observed at the Rexford residence; the investigating agents believed that the occupants were drug customers.  As a result of the stops, pound quantities of crystal methamphetamine were seized.  (Tr. at 41-42).

29

Based on tracking the silver F150 truck, in October 2015, the McClelland residence was identified as another location used by the drug trafficking organization. (Tr. at 11-12). On December 14, 2015, at approximately 2:30 p.m., a black Suburban (registered owner Shanecee Peterson, Albany, Georgia, the same as the Dodge Charger observed at the Rexford residence) arrived and parked in the driveway. (Tr. at 13, 16). TFO Hannan observed two black males exit the vehicle; the passenger's physical appearance being similar to that of the black male observed on August 20, 2015, at the Rexford residence, and subsequently identified as Defendant Lewis.[28] (Tr. at 13-14, 34-35, 43, 61). Defendant Lewis retrieved a brown bag from the back passenger seat of the vehicle and both men walked towards the front of the residence. (Tr. at 13). Based on his experience and the events he was observing, TFO Hannan "felt that there was a high chance that this was going to be a customer picking up some narcotics[.]"[29] (Tr. at 14). This opinion was reinforced by the arrival at the residence of two of the

---

[28]Based on the facts the registered owner of both vehicles was the same and the similarity of description of the black male passenger in both instances, the officers reasonably concluded that Defendant Lewis was also at the Rexford residence in August 2015. (Tr. at 14, 19, 38, 43).

[29]TFO Hannan has been a law enforcement officer for twenty-seven years, including seventeen years investigating narcotic traffickers with HIDTA. (Id. at 4-5). For the last ten years, he has been employed by the Fulton County Sheriff's Office ("FCSO") on detail to HIDTA. (Id.).

targets of the investigation, Tyler Owens and Warren Ferguson, followed by the men leaving in a white F150 truck and returning and with bags being carried into the residence by the targets.[30] (Tr. at 17-18). Shortly thereafter, Defendant Lewis and the second black male walked towards the Suburban, and the black male entered the driver's seat, and Defendant Lewis placed the brown bag in the back seat of the vehicle and got in the front passenger seat; the vehicle departed. (Tr. at 18-19). Based on this conduct and the investigation, TFO Hannan "believed that these were customers that were showing up to pick up whatever quantity of some narcotic from this organization." Although TFO could not be "sure" that the vehicle contained narcotics, he formed this belief based on his investigation - including the similarity in conduct at the Rexford and McClelland residences - and seventeen years "working drug investigations." (Tr. at 19; 37-38). The court finds that the totality of circumstances, in light of the officer's training and experience, established a reasonable suspicion that Defendant was engaged in criminal activity and that contraband would be found in the Suburban. See, e.g., Lindsey, 482 F.3d at 1290-91; Smith, 201 F.3d at 1323.

---

[30]The court notes that the description of the F150 trucks discussed is similar. The truck in which the tracking device was installed was described as being silver, and the one observed on December 14 was described as being white. (Tr. at 11, 17-18).

Because there was reasonable suspicion to support a brief investigatory stop of the Suburban, the court next considers whether the events subsequent to the initial stop were reasonably related in scope to the circumstances which justified the stop, see United States v. Hardy, 855 F.2d 753, 758 (11th Cir. 1988), or if the officer's actions constituted an arrest of the Suburban's occupants (before Defendant was formally placed under arrest).[31]  When determining if an encounter constituted a *de facto* arrest, several factors should be addressed, including: the law enforcement purposes to be served by the stop, the time needed to effectuate the purposes, the law enforcement officer's diligence in pursuing the investigation, and the scope and intrusiveness of the detention.  See United States v. Sharpe, 105 S. Ct. 1568, 1575 (1985); Acosta, 363 F.3d at 1146 (same).  And, "the most important factor 'is whether the [officer] detained [Defendant] to pursue a method of investigation that was likely to confirm or dispel

---

[31]Typically, "a traffic stop 'must last no longer than is necessary to effectuate the purpose of the stop.'"  United States v. Ramirez, 476 F.3d 1231, 1237 (11th Cir. 2007) (quoting United States v. Pruitt, 174 F.3d 1215, 1220 (11th Cir. 1999)); and see Rodriguez v. United States, 135 S. Ct. 1609, 1614 (2015) ("the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission' - to address the traffic violation that warranted the stop . . . and to attend to related safety concerns").  However, in this case, due to the articulable suspicion that Defendant Lewis was engaged in other criminal activity, the traffic stop is not limited to the processing of the traffic violation and, instead, is analyzed as a traditional Terry stop. See Terry, 88 S. Ct. 1868; United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001).

AO 72A
(Rev.8/82)

[his] suspicions quickly, and with a minimum of interference.'" United States v. Gil, 204 F.3d 1347, 1351 (11th Cir. 2000) (quoting Hardy, 855 F.2d at 759).

In resolving this issue, "[n]o brightline test separates an investigatory stop from an arrest.  Instead, whether a seizure has become too intrusive to be an investigatory stop and must be considered an arrest depends on the degree of intrusion, considering all the circumstances." Blackman, 66 F.3d at 1576.  The fact that law enforcement officers draw their weapons, order suspects out of their vehicles or to lie on the ground, conduct a frisk for weapons, handcuff or secure suspects, or ask for identification does not necessarily convert a stop into an arrest requiring probable cause. See Acosta, 363 F.3d at 1146-47; Diaz-Lizaraza, 981 F.2d at 1221; United States v. Aldridge, 719 F.2d 368, 371 (11th Cir. 1983).  In fact, "[d]uring a lawful traffic stop, officers . . . may take steps that are reasonably necessary to protect their personal safety . . . , including requiring the driver and passengers to exit the vehicle 'as a matter of course.'" Spoerke, 568 F.3d at 1248 (quoting Maryland v. Wilson, 117 S. Ct. 882, 884 (1997); Pennsylvania v. Mimms, 98 S. Ct. 330, 333-34 (1977)).

Consideration of the events leading up to Defendant being formally placed under arrest establish that Lt. Henry conducted the Terry stop diligently and efficiently, with the minimal necessary interference with Defendant, to confirm the suspicions that

Defendant was engaged in criminal activity and that the Suburban contained illegal

narcotics.  After the Suburban moved over to the right side shoulder of the highway,

Lt. Henry and Deputy Thomas exited the patrol vehicle, with Lt. Henry approaching

the driver side and the Deputy approaching the passenger side of the Suburban.[32]  (Tr.

at 57-59, 73, 97).  The driver's side window was down, and Lt. Henry spoke with the

driver, Telrone Houston, and advised why the Suburban had been stopped.  (Tr. at 59).

As he spoke to the driver, Lt. Henry detected the smell of burnt marijuana.  (Tr. at 59-

60, 74-75).  He requested and received Houston's driver's license and then returned

to the patrol vehicle to conduct a license check and start the traffic citation.  (Tr. at 59-

60, 75).  Before completing the citation, Lt. Henry went back to the Suburban and

asked Houston to exit and to walk to the rear of the Suburban in order to speak to him,

leaving Defendant Lewis in the vehicle.  (Tr. at 60, 76-77).  Because he had detected

the odor of burnt marijuana, Lt. Henry asked Houston if there was marijuana in the

Suburban, and Houston responded, no, but that he had smoked marijuana earlier that

day.  (Tr. at 60, 78).  Lt. Henry advised Houston that a probable cause search of the

--------

[32]The only officers at the scene were Lt. Henry, Deputy Thomas and Trooper
Ennis. The Trooper remained in his patrol vehicle until the passengers of the Suburban
exited. (Tr. at 58, 99, 106).  All of the officers were in uniform and had firearms, but
the firearms were not drawn during the stop.  (Tr. at 86, 108).

34

Suburban would be conducted, and Defendant Lewis was also removed from the vehicle.  (Tr. at 61, 78).  Deputy Thomas and Trooper Ennis stood with the men who were not handcuffed.  (Tr. at 105-06).

Defendant challenges Lt. Henry's testimony that he detected the odor of burnt marijuana because the testimony is not corroborated, because no marijuana was found in the Suburban, because Houston advised the officer that there was no marijuana in the vehicle and because neither Lt. Henry nor Trooper Ennis deployed his K-9 to conduct an open air sniff of the Suburban.  [Doc. 42 at 10].  Detection of the odor of marijuana can provide probable cause to conduct a warrantless search of a vehicle.[33]

---

[33]Although as a general rule, the Fourth Amendment requires police officers to obtain a warrant before conducting a search, see California v. Carney, 105 S. Ct. 2066, 2069 (1985), in Carroll v. United States, 45 S. Ct. 280, 285 (1925), the Supreme Court established an exception to the warrant requirement for searches of automobiles and other moving vehicles.  Under the "automobile exception," "[i]f a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more."  Pennsylvania v. Labron, 116 S. Ct. 2485, 2487 (1996); see also United States v. Tamari, 454 F.3d 1259, 1261 (11th Cir. 2006) (indicating that "readily mobile" means "operational").  No separate exigent circumstances need to be shown.  See Maryland v. Dyson, 119 S. Ct. 2013, 2014 (1999); United States v. Watts, 329 F.3d 1282, 1286 (11th Cir. 2003) ("[T]his Court made it clear that the requirement of exigent circumstances is satisfied by the ready mobility inherent in all automobiles that reasonably appear to be capable of functioning.").  The validity of the search, accordingly, turns on whether there was probable cause to believe the vehicle contained contraband or evidence of a crime, Dyson, 119 S. Ct. at 2014; see also Lindsey, 482 F.3d at 1293 ("The key issue here is whether the police had probable cause for the search and seizure of the vehicle."),

35

See Merricks v. Adkisson, 785 F.3d 553, 560 n.3 (11th Cir. 2015) ("the smell of burnt marijuana emanating from a vehicle is sufficient probable cause to search a vehicle") (citing United States v. Tobin, 923 F.2d 1506, 1512 (11th Cir. 1991) (en banc)); United States v. Reed, 2019 WL 2710088, at *6 (N.D. Ala. May 3, 2019) ("Numerous Eleventh Circuit and precedential Fifth Circuit cases unequivocally rule that the odor of marijuana emanating from a vehicle establishes . . . probable cause for officers to search the vehicle.") (listing cases), report and recommendation adopted by 2019 WL 2643909 (N.D. Ala. June 27, 2019); Williams, 2017 WL 7411024, at *5 (rejecting the defendant's challenge to officer's credibility and finding that detection of the odor of burnt marijuana provided probable cause to search the vehicle) (citing United States v. Johnson, 445 Fed. Appx. 311, 313 (11th Cir. 2011) (detection of odor of marijuana provides probable cause for warrantless vehicle search)).

There is no evidence that disputes Lt. Henry's testimony that he detected the odor of burnt marijuana. Trooper Ennis testified that he did not approach the Suburban; however, he recalled Lt. Henry stating at the time that he smelled marijuana. (Tr. at 99-100, 106-07). The fact that no evidence was introduced that marijuana, burnt or otherwise, was found in the vehicle or on the occupants' persons does not

---

which is provided in this case by the odor of marijuana.

AO 72A
(Rev.8/82)

refute the officer's testimony.   The evidence introduced at the hearing does not foreclose consideration that burnt marijuana might have recently been in the vehicle or in one of the occupant's possession while in the vehicle.   In United States v. Salley, 341 Fed. Appx. 498, 500 (11th Cir. 2009), the defendant challenged the finding of the trial court that the officer's testimony was credible that he smelled the odor of burnt marijuana because there was no evidence that the defendant actually possessed or was using marijuana.   Id. at 499, 501 & n.4.   The court rejected the defendant's argument based on the lower court's finding, following a rigorous cross-examination, that the officer's testimony was credible.   Id. at 501.   Likewise, in United States v. Dericho, 2015 WL 5687766 (M.D. Fla. September 25, 2015), the court rejected the defendant's argument that the officer's testimony that he smelled burnt marijuana was not credible because no marijuana or related paraphernalia was found during the search of his vehicle.   Id., at **17-18.   In that case, the officer "testified that a lack of actual marijuana or related items in the vehicle is not necessarily inconsistent with smelling the odor" because the marijuana could have been smoked in the vehicle earlier or the smell could have been on the defendant's clothing.   Id., at *18.   See also United States v. White, 593 F.3d 1199, 1201, 1203 (11th Cir. 2010) (finding credible officer's testimony that he detected the strong odor of marijuana as he and second officer drove

37

by the defendant's vehicle, although second officer did not smell marijuana and no marijuana was found during subsequent search); United States v. George, 2010 WL 431783, at *8 (E.D. Mo. February 2, 2010) (rejecting the defendant's challenge to the officers' testimony as to the odor of marijuana based on no other evidence of drug possession or use, the court stated, "in common experience, the pungent odor of any smoked item, even cigarette smoke[,] can linger in a vehicle for quite some time and, thus, a mild odor of burnt marijuana could be smelled by the officers for a significant period of time after the marijuana had been smoked").

Also, the court finds, contrary to Defendant's arguments, that Lt. Henry reasonably explained why his K-9 was not deployed.[34] He stated that, because he had detected the odor of burnt marijuana, there was no reason to deploy the K-9. The officer also noted the threat to Kojak's safety on the side of the highway from passing traffic. In fact, a passing vehicle hit one of the patrol vehicles on scene that day. (Tr. at 62, 75). See United States v. Peters, 743 F.3d 1113, 118 (7th Cir. 2014) (in rejecting the defendant's challenge to the deputy's claim that he smelled the odor of marijuana based in part on the officer's failure to deploy a near-by police dog, the court found that "there was no need for the deputy to employ a dog specially trained to ferret out

---

[34]Trooper Ennis was not asked why he did not deploy his K-9. (Tr. at 93-112).

38

subtle odors of illicit drugs when the deputy was 'hit by an overwhelming smell of marijuana' when the window descended") (citation omitted).   There is nothing "inherently unbelievable" regarding the Lt. Henry's testimony. See Johnson, 445 Fed. Appx. at 313.   And, besides Defendant's contentions, "nothing in the record contradicts [the officer's] testimony" regarding detecting the odor of marijuana. United States v. Zabalza, 346 F.3d 1255, 1259 (10th Cir. 2003).

Having advised Houston of the reason for the search, and after Defendant was removed from the vehicle, Lt. Henry started the search of the Suburban.  (Tr. at 61, 78).  Less than an half hour after the start of the stop, Lt. Henry conducted the search of the Suburban and located a brown bag behind the back passenger seat on the floorboard, which he picked up and opened finding five kilogram packages of suspected cocaine.  (Tr. at 62, 85, 92, 100-01, 110).  He left the bag inside the Suburban and returned to his patrol vehicle where he advised Deputy Thomas and Trooper Ennis to detain Houston and Defendant Lewis.  Both men were handcuffed but remained standing outside of the vehicles.  No weapons were drawn.  Neither man was advised that he was under arrest.  (Tr. at 62-64, 85-86, 108).  Although these facts do not support a finding that Defendant was under arrest at this time, see Spoerke, 568 F.3d at 1248; Acosta, 363 F.3d at 1146-47; Diaz-Lizaraza, 981 F.2d at 1221; Aldridge,

719 F.2d at 371, even assuming that Defendant was under arrest, Lt. Henry had

probable cause warranting the arrest.

In Craig v. Singletary, 127 F.3d 1030 (11th Cir. 1997), the Eleventh Circuit

Court of Appeals stated:

> Probable cause to arrest exists when the facts and circumstances within
> the collective knowledge of law enforcement officers, or of which they
> have reasonably trustworthy information, would cause a prudent person
> to believe that the suspect has committed or is committing an offense. .
> . . Because "sufficient probability, not certainty, is the touchstone of
> reasonableness under the Fourth Amendment" . . . "probable cause itself
> is a doctrine of reasonable probability and not certainty[.]"

Id. at 1042 (citations omitted); see also Lindsey, 482 F.3d at 1291 ("Probable cause to

arrest exists when the totality of the facts and circumstances support 'a reasonable

belief that the suspect had committed or was committing a crime.'") (citation omitted).

Thus, "[s]ince a finding of probable cause requires only a probability of criminal

activity . . . a court assessing probable cause in hindsight must assess both the totality

of the circumstances and the inferences that flow from those circumstances."[35] United

_____

[35]As true with an evaluation of whether there is reasonable suspicion to support
a detention, "[i]n reviewing probable cause determinations, [a court] must consider the
totality of the circumstances-including the officers' training and experience as well as
their knowledge of the situation at hand." United States v. Buchanan, 70 F.3d 818, 826
(5th Cir. 1996). "[A] police officer may draw inferences based on his own training and
experience in deciding whether probable cause exists . . . ." United States v. Reeves,
604 Fed. Appx. 823, 827 (11th Cir. 2015).

40

States v. Wai-Keung, 845 F. Supp. 1548, 1557 (S.D. Fla. 1994), aff'd, 115 F.3d 874 (11th Cir. 1997) (citations omitted).  In addition to the information outlined supporting reasonable suspicion for the stop and detention, Lt. Henry's discovery of the kilogram packages of suspected cocaine in the brown bag previously carried and placed in the Suburban by Defendant established probable cause for his arrest.  Defendant, who had been lawfully detained, if deemed under arrest by being placed in handcuffs, was lawfully under arrest.

For these reasons, the court finds that the Suburban was lawfully stopped based on probable cause to believe that a traffic offense had occurred or, in the alternative, that Lt. Henry conducted a lawful Terry stop based on a reasonable suspicion that the occupants of the vehicle were engaged in criminal conduct and that illegal narcotics were in the vehicle.  The court also finds that Lt. Henry conducted the Terry stop diligently and lawfully searched the Suburban based on probable cause.  Accordingly, the court recommends that Defendant's motion to suppress evidence, the cocaine secreted in the brown bag, be denied.

### 3.    Statements

Defendant seeks to suppress a pre-Miranda statement that he made claiming ownership of the brown bag and a written statement that he claims was also provided

41

without <u>Miranda</u> warnings.  Defendant also claims that the statements were tainted by the allegedly unlawful stop.  [Doc. 42 at 11-12].  And Defendant seeks to suppress statements he made at the Fulton County jail, again, contending that the statements were tainted by the unlawful stop and arrest and that he was not advised of his <u>Miranda</u> rights.  [<u>Id.</u> at 12-14].  The Government argues that the first statement was spontaneous and not made in response to custodial interrogation and that the second and third statements were made after Defendant was advised of and waived his <u>Miranda</u> rights.  [Doc. 51 at 16-20].  With respect to Defendant's claim that the statements are inadmissible as being tainted by an illegal stop and arrest, because the court found that the Defendant was lawfully detained and arrested and that his vehicle was lawfully searched, his statements do not constitute fruit of an unlawful arrest or search and seizure.  <u>United States v. Lopez-Garcia</u>, 565 F.3d 1306, 1315 (11th Cir. 2009) (the defendant's "fruit of the poisonous tree argument plainly collapses since . . . his Fourth Amendment rights were never violated").

With respect to his first statement claiming ownership of the brown bag, the following additional facts are pertinent to the court's recommendation.  After requesting that Houston and Defendant be handcuffed, Lt. Henry returned to the Suburban and retrieved the brown bag, carrying it to his patrol vehicle in his right

AO 72A
(Rev.8/82)

hand.  (Tr. at 62-64, 85-86, 108-09).  Defendant Lewis stated that the bag was his.  (Tr.

at 63, 87).  Lt. Henry placed the bag on the hood of his patrol vehicle and returned to

complete the search of the Suburban, not locating any further contraband.  (Tr. at 63,

87-88).  By simply carrying the brown bag to the patrol vehicle, the officer was not

seeking any verbal response from Defendant, and no verbal response was required.

Assuming that Defendant was in custody, his statement is admissible as a spontaneous

and volunteered statement that was not the result of interrogation or the functional

equivalent of interrogation.  See Rhode Island v. Innis, 100 S. Ct. 1682, 1689-90

(1980) ("any words or actions on the part of the police (other than those normally

attendant to arrest and custody) that the police should know are reasonably likely to

elicit an incriminating response from the suspect" constitute interrogation); United

States v. Sanders, 315 Fed. Appx. 819, 823 (11th Cir. 2009) ("'Voluntary and

spontaneous comments by an accused . . . are admissible evidence if the comments

were not made in response to government questioning.'") (quoting Cannady v. Dugger,

931 F.2d 752, 754 (11th Cir. 1991)); United States v. Hendrieth, 922 F.2d 748, 751

(11th Cir. 1991) ("When a defendant deliberately chooses to initiate or continue a

conversation, . . . the statements violate neither the Fifth Amendment right against self-

incrimination nor the Sixth Amendment right to counsel.") (citations omitted).

43

The circumstances surrounding the statement as identified by Defendant, that is, the brief, lawful detention by three armed officers and "then confronted with incriminating evidence" [Doc. 42 at 12], did not constitute interrogation or its functional equivalent.  In United States v. McKenzie, 132 Fed. Appx. 788 (11th Cir. 2005), the Eleventh Circuit Court of Appeals addressed and rejected claims similar to those made by Defendant Lewis in this case.  In McKenzie, officers were executing a search warrant at the residence where the defendant was residing and placed him under arrest for failure to pay child support.  Id. at 789.  The defendant was not advised of his Miranda rights.  One of the searching officers advised the defendant that they had found some marijuana and some cocaine.  The defendant stated "that he smoked marijuana and did [the officer] ever think he was a user or did [the officer] just figure he was a dealer" and told the officer, "Go mess with the folks on the lake.  That's where all the real dope is.  He said if they called him right now and tested him, he would blow the machine up."  Id. (citation and internal quotation marks omitted).  The court found that the officer did not interrogate the defendant and stated, "About the drugs, [the officer] merely stated what was discovered in [the defendant's] room; he did not ask [the defendant] questions about the seized contraband."  Id. at 790.  The court held that neither the statement about the evidence, nor the surrounding

44

circumstances, supported a finding that the defendant's statement was in response to the functional equivalent of interrogation.  Id. (noting that the defendant's arrest did not involve "an 'unusual degree of force'" and "that a 'police arrest or seizure [is not, by itself] so coercive [as to] transform a situation into one of functional interrogation'") (citation omitted).  And in United States v. Hicks, 546 F. Supp. 2d 1378 (N.D. Ga. 2008), based on facts markedly similar to those before this court, the district court rejected the defendant's claim that he was subjected to the functional equivalent of interrogation as he was being detained during a search of his vehicle. The officer found a firearm in the vehicle, and the defendant, who was sitting on the curb near the rear of his vehicle, observed the officer place the firearm on the trunk. The defendant stated, "Man, that's mine.  I can't let that man take my charge."  Id. at 1381-82 (citation and internal quotation marks omitted).  The court found that the statement was "a volunteered, spontaneous statement which is not barred by Miranda because it was not made in response to interrogation or its functional equivalent."  Id. at 1381; and see United States v. Lariscy, 2008 WL 621216, at **4-5 (S.D. Ga. March 4, 2008) (same).  Likewise, in this case, the simple fact of Lt. Henry retrieving the brown bag and placing the bag on the hood of his patrol vehicle, as Defendant was

45

detained during the Terry stop, did not constitute the functional equivalent of interrogation.  Defendant's statement is admissible.

And the second and third statements, made after Defendant was formally placed under arrest, followed Defendant being advised of and waiving his Miranda rights. "Miranda 'warnings are required before any statement may be admitted into evidence at trial which was elicited from a person in custody through interrogation.'"  United States v. Adams, 1 F.3d 1566, 1575 (11th Cir. 1993) (quoting Endress v. Dugger, 880 F.2d 1244, 1248 (11th Cir. 1989)).  The first question that the court must answer is whether Defendant was advised of his Miranda rights.  See United States v. Barbour, 70 F.3d 580, 585 (11th Cir. 1995) ("The threshold inquiry is whether [the defendant] was informed of his Miranda rights.").  In reaching this answer, the Supreme Court stated that it "has never indicated that the 'rigidity' of Miranda extends to the precise formulation of the warnings given a criminal defendant" and that "no talismanic incantation [is] required to satisfy its strictures."  California v. Prysock, 101 S. Ct. 2806, 2809 (1981).  The answer to this question for the written statement provided to Lt. Henry, although disputed by Defendant, is yes.

Once the search of the Suburban was completed and Lt. Henry updated TFO Hannan, the officer advised Defendant that he was under arrest and then advised him

46

of his Miranda rights reading from a screen shot saved on his cellular telephone.  (Tr. at 64).  Defendant was advised that he had the right to remain silent, that anything he said could be used against him in court, that, if he could not afford a lawyer, one would be appointed for him by the court and that he had the right to refuse to answer questions and to discontinue questioning at anytime.  (Tr. at 64-65).  Defendant challenges the credibility of Lt. Henry's testimony because there is no corroboration. [Doc. 42 at 12-13].  However, no evidence introduced at the hearing disputed Lt. Henry's testimony which the court observed and finds credible.  See Smith v. McNeil, 2010 WL 1192430, at **10-11 (N.D. Fla. February 19, 2010) (rejecting the petitioner's contention that, because there was no documentation of Miranda rights being given, officer's testimony lacked corroboration and was not credible), report and recommendation adopted by 2010 WL 1192388 (N.D. Fla. March 23, 2010).  Having found that Defendant was advised of his rights, the court must next determine whether Defendant voluntarily, knowingly and intelligently waived those rights.[36]  See Barbour, 70 F.3d at 585.

---

[36]"It is well established that '[t]he government must prove by a preponderance of the evidence that [the defendant] made a knowing, voluntary and intelligent waiver of his Miranda rights.'"  United States v. Chirinos, 112 F.3d 1089, 1102 (11th Cir. 1997) (citation omitted).

This is a two-part inquiry:

"First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.  Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the <u>Miranda</u> rights have been waived."

<u>Id.</u> (quoting <u>Moran v. Burbine</u>, 106 S. Ct. 1135, 1141 (1986) (internal citations and quotations omitted)); <u>see also</u> <u>United States v. Farley</u>, 607 F.3d 1294, 1326 (11th Cir. 2010) (same).  The totality of all the surrounding circumstances, which a court must evaluate to make these determinations, includes "both the characteristics of the accused and the details of the interrogation." <u>Schneckloth v. Bustamonte</u>, 93 S. Ct. 2041, 2047 (1973); <u>see also</u> <u>United States v. Bernal-Benitez</u>, 594 F.3d 1303, 1319 (11th Cir. 2010) (same).  No single factor is necessarily determinative of the issue whether a defendant voluntarily, knowingly and intelligently waived his rights, but the court must engage in a fact-specific inquiry based on all of the circumstances.  <u>See</u> <u>Moore v. Dugger</u>, 856 F.2d 129, 134 (11th Cir. 1988).

After Defendant was advised of his rights, Defendant elected to waive his rights, and he prepared a written statement and signed the statement which has the time of

48

7:03 p.m.  (Tr. at 65-66, 88-89; Gov't Exhibit 3).  At the bottom of the statement, above Defendant's signature, is the following typed statement:  "I certify that I have made the above statement of my own free will and without duress.  I fully understand that I am not required to make a statement and by making this statement, I do so understanding it can be used in court as evidence.  I am aware that there are criminal penalties, up to and including prosecution, if this statement is made to deceive or obstruct the due process of law."  (Tr. at 65-66; Gov't Exhibit 3).

Defendant does not make any specific arguments supporting a finding that Defendant did not voluntarily, intelligently and knowingly waive his Miranda rights with the exception of pointing to the fact that he had been detained for approximately an hour when he made the first statement.  [Doc. 42 at 12].  To the extent Defendant is also arguing that the lack of an executed Miranda waiver form undermines either the validity of his waiver or Lt. Henry's testimony concerning the waiver, that argument lacks merit.  A written waiver of rights form is not required to establish that a defendant knowingly, intelligently and voluntarily waived his Miranda rights.  The lack of a written waiver does not undermine the validity of an express oral waiver. See, e.g., Bernal-Benitez, 594 F.3d at 1319 ("failing to obtain a signed Miranda waiver alone is not proof that the defendant did not freely and intelligently waive his rights");

49

United States v. Dowd, 451 F.3d 1244, 1250-51 (11th Cir. 2006) (noting that even a refusal to sign a written waiver of rights form does not establish the absence of a voluntary and knowing oral waiver); United States v. Stephens, 202 F. Supp. 2d 1361, 1370 (N.D. Ga. 2002) (either express oral or written waiver of Miranda rights is strong proof of validity of waiver).  And there is nothing inherently coercive about the fact that Defendant was detained during the Terry stop for approximately an hour, especially in light of the facts that the officers had not drawn their weapons, that Defendant remained standing outside in view of the passing public on the highway, and that there is no evidence of threats or other coercive actions by the officers.  Those cases where courts have found confessions to be involuntary "all have contained a substantial element of coercive police conduct." Colorado v. Connelly, 107 S. Ct. 515, 520 (1986).  "Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession."  United States v. Thompson, 422 F.3d 1285, 1295-96 (11th Cir. 2005) (citation and internal quotation marks omitted) ("Government coercion is a necessary predicate to a finding of involuntariness under the Fifth Amendment."); accord United States v. Jackson, 249 Fed. Appx. 130, 133 (11th Cir. 2007).  And as argued by the Government, the written

AO 72A
(Rev.8/82)

statement corroborates both that Defendant was aware of his rights and voluntarily provided the short statement claiming ownership of the brown bag. (Gov't Exhibit 3). Defendant's written statement is admissible.

Likewise, Defendant's statement at the jail is admissible. First, the undisputed evidence establishes that Defendant was advised - a second time - of his <u>Miranda</u> rights. TFO Hannan and TFO Mathew Dembowski met with Defendant Lewis at the sally port for the Fulton County jail later on the day of his arrest. (Tr. at 24-25). They sat on a bench outside the door to the jail. (Tr. at 25). In order to protect from disclosure of the drug investigation, TFO Hannan identified himself as an investigator with the FCSO. (Tr. at 25-26). TFO Dembowski provided TFO Hannan with a <u>Miranda</u> rights card in order to read Defendant his rights. (Tr. at 26, 40). Hannan advised Defendant that he had the right to remain silent, that anything he said could be used against him in a court of law, that he had the right to have an attorney with him during questioning, and that, if he could not afford an attorney, one would be appointed for him. (Tr. at 27). TFO Hannan, on cross-examination, stated that he could not testify that the rights he stated were verbatim from the card but that all cards "say essentially the same thing, the Miranda rights and the waiver." (Tr. at 40-41). On redirect, the TFO testified that he was sure that he advised Defendant of his right to

51

remain silent, right against self-incrimination, right to counsel and right to discontinue questioning. (Tr. at 43). Defendant's challenge is again that there is no corroboration that he was advised of his rights or waived his rights. [Doc. 42 at 13-14]. Defendant's arguments are not persuasive. TFO Hannan's testimony was credible; corroboration is not required; and the testimony is not disputed by other evidence. See Smith, 2010 WL 1192430, at **10-11.

The court also finds that Defendant voluntarily, knowingly and intentionally waived his rights. Defendant stated that he understood his rights and that he wished to make a statement. (Tr. at 27). TFO Hannan said that neither officer was armed (because of being at the jail), that Defendant remained handcuffed, that Defendant never asked to stop the interview and that Defendant did not appear to be under the influence of drugs or alcohol. (Tr. at 45-47). The TFO did not threaten Defendant or make him any promises. (Tr. at 48). He was confident that Defendant understood what was happening. (Tr. at 47). However, he did not ask Defendant about his educational background or whether he could read or write English. (Tr. at 49).

Again, Defendant does not make specific arguments contending that he did not waive his rights, only pointing out that by this time he had been detained for over three hours. [Doc. 42 at 13-14]. The facts simply do not support a finding that Defendant's

statement was involuntary.  See Connelly, 107 S. Ct. at 520; Thompson, 422 F.3d at 1295-96.  As stated *supra*, a written waiver is not required for finding of a valid waiver of Miranda rights.  See Bernal-Benitez, 594 F.3d at 1319; Dowd, 451 F.3d at 1250-51. TFO Hannan credibly explained why he did not use the written advice of rights and waiver form that he had in his possession, that is, because he did not want to disclose the underlying investigation and because the Miranda rights and waiver form that TFO Hannan had was issued by DEA, noting DEA on the form.   (Tr. at 26, 40). Defendant's statement at the jail is admissible.

The court finds that Defendant's first statement claiming ownership of the bag, assuming that he was in formal custody, was not the result of interrogation or the functional equivalent of interrogation, that Defendant's written statement claiming ownership of the brown bag followed being advised of and validly waiving Miranda rights, and that his statement at the jail followed being advised of and validly his Miranda rights.  Accordingly, Defendant's motion to suppress his statements should be denied.

### 4.      Collateral Estoppel

Finally, Defendant argues that the Government should be precluded from introducing evidence, the brown bag containing the kilograms of cocaine, at trial

53

because the legality of the stop was previously decided by the Fulton County Superior Court in a case in which there was privity between the state and federal governments. [Doc. 42 at 15-22].  Defendant contends that the Government should be precluded - estopped - from relitigating the same facts that were addressed by the Superior Court Judge because of the interaction between the federal investigative agents, particularly TFO Hannan and Lt. Henry, resulting in first the state and then federal drug charges being filed against him.  [Id.].  The Government opposes application of the doctrine of collateral estoppel responding to Defendant's privity arguments by pointing out that Defendant's focus on the investigative stage of the case, and not the prosecution of Defendant by two separate sovereigns without any allegation of involvement by the federal government in the state's prosecution, does not establish privity.  [Doc. 51 at 20-24].  The Government is correct that the facts do not establish privity as required for the application of collateral estoppel in this case.  Additionally, the record indicates that the issues and facts in the record before this court were not fully or adequately litigated in the Superior Court.

As stated by the Eleventh Circuit Court of Appeals in Harvey v. United States, 770 Fed. Appx. 949 (11th Cir. 2019),

54

> Issue preclusion prevents a party from litigating an issue in a later action if that issue was fully litigated in an earlier action. . . .  For issue preclusion to apply, (1) the issue in the case must be identical to the one previously litigated; (2) the issue must have been 'actually litigated' in the earlier lawsuit; (3) 'the determination of the issue in the prior suit was a necessary part of the judgment in that action'; and (4) 'the parties are the same or in privity with each other and the party against whom the earlier decision is asserted had a full and fair opportunity to litigate the issue in the earlier proceeding.'"

Id. at 954 (citations omitted).  Whether the doctrine of issue preclusion or collateral estoppel is applicable in successive state and federal prosecutions under the circumstances presented in this case - that is, using a prior Superior Court Judge's suppression ruling to bar use of evidence in a subsequent federal prosecution - has not been decided by the Eleventh Circuit Court of Appeals.  Although Defendant cites the Court of Appeals' decision in United States v. Perchitti, 955 F.2d 674 (11th Cir. 1992), for the proposition that collateral estoppel is applicable, the Perchitti court noted, "Whether issue preclusion may apply in the criminal context to bar one governmental entity from relitigating a pretrial suppression order previously rendered against another governmental entity *is an open question*." Id. at 675 (emphasis added).  The court only held, because of the circumstances in that case, that it "need *not decide* the applicability of issue preclusion to successive criminal prosecutions by multiple sovereigns . . . ." Id. at 675-76 (emphasis added).  The Perchitti court did not find that

issue preclusion applies in successive state and federal criminal cases.  And see United States v. Neal, 2009 WL 88498, at *3 (S.D. Ala. January 13, 2009) (citing Perchitti, 955 F.2d at 675-76, and noting that the question of the applicability of issue preclusion in successive criminal prosecutions has not been decided in the Eleventh Circuit Court of Appeals).[37]  Other decisions by the Eleventh Circuit Court of Appeals indicate that Federal courts are not bound by state criminal court decisions.  See, e.g. United States v. One Piece of Real Property Located at 5800 SW 74th Avenue, Miami, Florida, 363 F.3d 1099, 1100-01 & n.1 (11th Cir. 2004) (following a joint federal and local police drug investigation and search of defendant's residence resulting in the seizure of a quantity of marijuana and drugs, the defendant was initially prosecuted by state

---

[37]And the other cases relied on by Defendant to support his argument that collateral estoppel or issue preclusion is applicable, Harvey v. United States, 2017 U.S. Dist. LEXIS 4152 (S.D. Fla. January 10, 2017); Maxwell v. Coker, 1990 U.S. Dist. LEXIS 17483 (S.D. Ala. December 20, 1990); and United States v. Mulherin, 529 F. Supp. 916 (S.D. Ga. 1981), are procedurally distinguishable.  The Harvey decision involved the question of applying collateral estoppel in a *federal civil* case, a claim pursuant to Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics, 91 S. Ct. 1999 (1971), based on the events occurring in a prior *federal criminal* case - same sovereign and application in a civil proceeding.  In Maxwell, the question was the applicability of collateral estoppel in a *federal civil* proceeding, an action against officers for violation of civil rights, 42 U.S.C. § 1983, based on a prior state court decision in a criminal case involving the same parties - application in a civil proceeding.  And in Mulherin, the issue of collateral estoppel arose in a subsequent *federal prosecution* of the same defendants that had been acquitted in a prior *federal prosecution* - same sovereign.

56

authorities but the evidence from the search was suppressed by the state court; that prosecution was followed by the federal forfeiture action in which the defendant again sought to suppress the evidence seized from the residence; and the appellate court noted that "[f]ederal courts . . . are not bound by the state court's decision"); United States v. Mastrangelo, 733 F.2d 793, 797-99 (11th Cir. 1984) (rejecting the claim that collateral estoppel bars use of evidence in federal case due to resolution of criminal charges, based on same evidence, in state court because "the admissibility of evidence in a federal prosecution is governed by federal law, rather than state law").

However, assuming, as did the court in Perchitti, that the doctrine might be applicable, the court finds that the Government was not in privity with the state during the prosecution of the motion to suppress in Superior Court. The court also finds that the Government was not afforded a full and fair opportunity to litigate the issues currently before this court and that the issues and facts presented in this court are not the same as presented in the Superior Court such that all of the issues before this court were not "actually litigated" in the Superior Court.

"A party need only identify 'one material differentiating fact that would alter the legal inquiry' to overcome issue preclusion." Harvey, 770 Fed. Appx. at 954 (citation omitted). In this case there are several distinguishing material facts. After being

57

indicted in Fulton County, Defendant moved to suppress the evidence seized from the Suburban, and the Superior Court Judge initially and on reconsideration denied the motion to suppress based on evidence focusing solely on the traffic stop conducted by Lt. Henry.  [Doc. 42, Order].  On a second motion for reconsideration, the Superior Court Judge entered an order granting the motion to reconsider and Defendant's motion to suppress.  [Id.].  The additional evidence considered by the Superior Court Judge was a DEA report detailing the surveillance of the McClelland residence on December 14, 2015, and Lt. Henry being contacted by an agent and, as phrased by the judge, "instructed [to] follow the vehicle carrying Defendant as a passenger and 'to conduct a traffic stop of a suspected drug trafficker if a traffic violation is observed.'" [Id.].  The Superior Court Judge noted that the Deputy did not inform the court "that the traffic stop was made pursuant to instructions from an HIDTA agent."  [Id.].  The judge stated, "Implicit in this instruction was that Deputy Henry was to conduct a search of the vehicle once he stopped it."  [Id.].  Also, in evidence before the Superior Court Judge was testimony by the Suburban's driver, Houston, who denied speeding, and the fact that the speeding ticket was subsequently dismissed.  [Id.].  The Superior Court Judge also opined that, based on the video from Trooper Ennis' vehicle, it did not appear that either the Deputy's or the Defendant's vehicle was traveling as fast as

58

83 miles per hour.  [Id.].  Houston also denied ever telling the Deputy that he had

smoked marijuana that day.  [Id.]. The judge noted that Houston had denied smoking

marijuana in the vehicle or that there was marijuana in the vehicle and that the Deputy

did not deploy his K-9 to conduct a "drug sniff."  [Id.].  Based on the evidence, the

Superior Court Judge found, "The only conclusion the Court can draw after reading

the DEA report is that Deputy [Henry] never smelled burning marijuana.  He simply

wanted an excuse to search the car.  More specifically, he wanted to inspect the 'brown

bag' and its contents."  [Id.].  The judge concluded, "It thus appears that the traffic stop

may well have been entirely pre-textual and that Houston was not speeding at the time

he was pulled over."  [Id.].  The Superior Court Judge granted the motion to dismiss.

[Id.].

        It is evident that the evidence before the Superior Court Judge did not include

all of the surveillance conducted, especially at the Rexford residence, prior to the stop

of the Suburban and that the Superior Court Judge was not presented with the issue of

whether a Terry stop based on reasonable suspicion that the occupants were engaged

in criminal conduct or that contraband would be in the vehicle justified Lt. Henry's

actions.  The Superior Court Judge solely ruled, based in part on evidence not before

this court, on the issue of whether there was probable cause to conduct a traffic stop

59

and, frankly, drew conclusions that this court finds not warranted based on the evidence in this case.  And the judge made that ruling without conducting a hearing to allow Lt. Henry to address the request to assist TFO Hannan - the order references reading the DEA report and conclusions drawn from reading the report but not from testimony by witnesses regarding the DEA report.  Accordingly, the information in the DEA report upon which the Superior Court Judge relied in reconsidering the motion to suppress was not "actually litigated" even in the Superior Court.  Moreover, the Superior Court Judge entered his ruling relying on evidence from the driver of the Suburban, Houston, not presented at the hearing conducted in this case.  And it appears that the Superior Court Judge applied state not federal law in resolving the motion to suppress when he concluded that the traffic stop "may well have been entirely pre-textual" [Order] - pretext, or an officer's subjective intentions, plays no role in analysis of the Fourth Amendment under federal law under the circumstances before this court. See Jones, 377 F.3d at 1314 (the law is well established that "'[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis'") (quoting Whren, 116 S. Ct. at 1774).  There are clearly multiple "'material differentiating fact[s] that would alter the legal inquiry' to overcome issue preclusion."  Harvey, 770 Fed. Appx. at 954 (citation omitted).

60

And, as the Government contends, there is a lack of privity between the state and federal *prosecuting* authorities such that the Government was not afforded "a full and fair opportunity to litigate" the motion to suppress in the Superior Court proceeding. Contrary to Defendant's arguments in which he places too much reliance on the decision in Perchitti, the court finds that in order for there to be privity between prosecuting authorities there must be evidence of "[i]nvolvement of the United States equivalent to control of the state criminal prosecution[.]" United States v. Nasworthy, 710 F. Supp. 1353, 1355 (S.D. Fla. 1989); and see United States v. Davis, 906 F.2d 829, 833, 835 (1st Cir. 1990) (noting that application of collateral estoppel to pretrial orders in successive state and federal prosecutions is an open question, the court concluded that "[a]t a minimum, it must be shown that federal prosecutors actively aided the state prosecutors during the local suppression hearing").[38]  In Perchitti, the court noted that several factors are relevant in identifying the nexus necessary for a finding of privity, including:

---

[38]The court in Davis also noted that, even if privity was established, "collateral estoppel would be inappropriate unless the issue resolved in the first proceeding was the same as the issue sought to be relitigated" which would not be the case if the state suppression order was based on state law because in federal court "evidence should be suppressed only where federal law has been violated and the federal exclusionary rule applies." Id. at 835.

AO 72A
(Rev.8/82)

> Privity may be found where a non-party substantially controls, or is represented by, a party to the action. . . . Another formulation requires that the party estopped must have been 'so closely related to the interest of the party to be fairly considered to have had his day in court.' . . . Still another derivative is that there must be a 'substantial identity' of the parties such that the party to the action was the virtual representative of the party estopped.

955 F.2d at 676 (citations omitted). The court also noted that, under the circumstances of dual sovereigns - such as the case before that court, "the Supreme Court's teaching in the double jeopardy context arguably provides additional guidance for [the] privity inquiry." Id. (citing Bartkus v. Illinois, 79 S. Ct. 676 (1959)). In Bartkus, the Supreme Court stated that "a second prosecution may be barred where one prosecuting sovereign can be said to be acting as a 'tool' of the other, or where the second prosecution amounts to a 'sham and cover' for the first." Id. (quoting Bartkus, 79 S. Ct. at 678).

The court in Perchitti rejected two arguments made by the defendants to establish privity. First, the defendants pointed out that the prosecutor in the state action was subsequently appointed as Special Assistant U.S. Attorney for the prosecution of the federal case. The court rejected the argument because the *prosecutor* did not wear both hats simultaneously - had that been the case, the court stated that the question might have been closer. Id. at 677. The defendants then

62

pointed to the interaction and cooperation of the agents and officers investigating the defendants' activities resulting first in the state prosecution and then in the federal prosecution which included sharing information obtained but not direct interaction as the investigations were being conducted.  The court rejected this argument, stating: "This level of cooperation between federal and state authorities in investigating the defendants does not establish privity between the state and federal governments for the *purposes of prosecution*." Id. (emphasis added).  Nothing in the court's decision leads to the conclusion that a closer or more direct cooperation *investigating* a case might be sufficient to satisfy the privity requirement.

And in Nasworthy, the district court rejected the defendant's argument that collateral estoppel, based on the state court granting a motion to suppress evidence, barred use of the evidence in federal court.  710 F. Supp. at 1355.  In Nasworthy, United States Customs Officers conducted an investigation resulting in a search of a vessel first observed on the inter-coastal waterways.  Id. at 1354.  Bales of marijuana were seized.  Id.  After the federal drug agency declined prosecution, the defendant was charged by the state, and the defendant filed a motion to suppress which the state court granted suppressing the marijuana.  Id. at 1354-55.  The federal government then charged the defendant based on the same events and using the marijuana.  Id. at 1355.

63

The district court first noted that the "[t]he key issue is the identity of the parties in the state and federal prosecutions." Id.  Although the court agreed with the defendant that "substantial involvement in a prior state suit by the federal government in which it is in control of that litigation will preclude it from relitigating the issue in a federal forum[,]" that involvement must be "equivalent to control of the state criminal prosecution" which was not established.  Id.  The defendant relied on the facts that the federal government organized and funded the investigation, that federal agents using federal equipment conducted the search and arrested the defendant, that the defendant was initially arrested on federal charges, that federal agents allowed state authorities to prosecute the defendant, and that the arresting federal agents were the only witnesses against the defendant in the state suppression hearing.  Id. 1355-56.  The court rejected the defendant's argument, stating:

> While these facts do indicate involvement by federal authorities, they only indicate that degree of participation contemplated in Abbate[ v. United States, 79 S. Ct. 666 (1959),] between different sovereigns.  Once the state of Florida decided to prosecute the defendant, it controlled the litigation, not the United States.  The mere fact that federal law enforcement officers testified on behalf of the state authorities certainly does not rise to the degree of 'control' found wrongful in Montana v. United States[, 99 S. Ct. 970, 973-74 (1979)].[39]

---

[39]In Abbate, the Supreme Court set forth "accepted law that there is no violation of Double Jeopardy when both the state and federal sovereigns prosecute an individual

Id. at 1355-56.  The facts of this case, which do not include Defendant being arrested by federal agents or federal agents conducting the stop and search or testifying as the only witnesses in the state suppression hearing, likewise do not establish "[i]nvolvement of the United States equivalent to control of the state criminal prosecution[,]" id. at 1355, especially given the absence of any suggestion much less proof of that federal prosecutors took part in or controlled the state prosecution.[40]

───────────

on similar charges arising out of the same facts." Nasworthy, 710 F. Supp. at 1355. In Montana, the Supreme Court stated that an issue or fact "'distinctly put in issue and directly determined'" by one court "'cannot be disputed in a subsequent suit between the same parties or their privies.'"  Nasworthy, 710 F. Supp. at 1355 (quoting Montana, 99 S. Ct. at 973).

[40]The decision by the First Circuit Court of Appeals in Davis, 906 F.2d 829, provides a persuasive and thorough analysis of the applicability of collateral estoppel to successive state and federal criminal prosecutions.  After noting that the authority to bring local charges "belonged exclusively" to the local district attorney and that "the authority to bring federal charges was vested solely in the United States Attorney[,]" that court discounted the role played by task force officers who neither file charges nor control prosecutions. Id. at 834.  The court noted that "it has long been recognized that mere participation by federal agents in an investigation does not implicate the United States as a sovereign" and that the First Circuit "has refused to give collateral estoppel effect to a state suppression order where there was substantial federal participation in the initial investigation."  Id. (listing cases).  For this reason, "the focus of [the collateral estoppel] inquiry must be on those with the authority to act in their sovereign's name, the prosecutors, and not the law enforcement officers assigned to the Task Force."  Id.  Because there was no evidence that federal prosecutors were present during the state suppression hearing or provided any assistance or advice to local prosecutors or were involved in the state prosecution, the court concluded that the federal government's "interest[] in enforcing federal law [was not] sufficiently

Finally, to the extent as expressed by the court in <u>Perchitti</u> that the question of applying collateral estoppel to a federal prosecution following a state prosecution is guided by the "Supreme Court's teaching in the double jeopardy context[,]" <u>Perchitti</u>, 955 F.2d at 676, that guidance regarding sham prosecutions does not support Defendant's arguments. In <u>United States v. Gholikhan</u>, 370 Fed. Appx. 987 (11th Cir. 2010), the Eleventh Circuit Court of Appeals explained that, to qualify as a sham prosecution, "'the defendant must show that one sovereign was so dominated, controlled, or manipulated by the actions of the other that it did not act of its own volition.'" <u>Id.</u> at 990 (quoting <u>United States v. Baptista-Rodriguez</u>, 17 F.3d 1354, 1361 (11th Cir. 1994)). Accordingly, "'[e]vidence that one sovereign dominated the investigation' may bolster a sham prosecution claim, but 'factual allegations [ ] relating to the investigation alone [are] insufficient to' qualify for the sham prosecution exception to the dual sovereignty doctrine." <u>Id.</u> (quoting <u>Baptista-Rodriguez</u>, 17 F.3d at 1362 n.7).[41] The court in <u>Baptista-Rodriguez</u> held "that if an exception to the dual

---

represented." <u>Id.</u> at 835.

[41]The appellate court found that, excepting unsubstantiated conclusions, the defendant only identified United States government involvement in the investigation of the drug offense, that is, being solely responsible for the discovery and exposure of the drug trafficking group, conducting the undercover negotiations, and testifying as the principle witnesses at trial when the Bahamian government charged the defendants,

66

sovereignty doctrine exists, that exception requires a showing that one sovereign controlled, dominated, or manipulated the *prosecution* of the defendant by the other." 17 F.3d at 1362 (emphasis in original).  Likewise, in <u>United States v. Flournoy</u>, 2015 WL 13736234 (N.D. Ga. August 3, 2015), the court rejected the defendant's argument that the cooperation between federal and state law enforcement authorities during the investigation of a case established that the first state prosecution was a sham.  <u>Id.</u>, at **7-8.[42]  In <u>Flourney</u>, the defendant argued, (1) because a local officer, while gathering evidence against the defendant "wearing his 'state hat,'" also participated as part of the federal prosecution team as a deputized task force officer wearing his "'federal hat'" and (2) because that officer gave state prosecutors the "'go ahead'" to go forward with their case "while he was simultaneously presenting the case to federal prosecutors[,]" he had established a sham prosecution.  <u>Id.</u>, at *8 (citation omitted).  The court rejected the defendant's arguments and held that "nothing [the defendant] alleges remotely suggests that the state's prosecution of [him] was a mere 'sham' here.  Even 'extensive

_____

and stated that such evidence says little or nothing about whether the United States government interfered in the prosecution of the case.  <u>Baptista-Rodriguez</u>, 17 F.3d at 1361.

[42]This case involved a successive prosecution by the federal government after the defendant was convicted in state court based on the same underlying events and not an argument about the applicability of collateral estoppel.  <u>Id.</u>, at *7.

67

law enforcement and prosecutorial cooperation between two sovereigns does not make a trial by either a sham.'" Id. (citation omitted).

As noted, Defendant's arguments focus solely on the investigation of his case. He makes no argument much less presents any facts establishing that federal prosecutors were in any way involved in the state prosecution, especially, the suppression hearing. The Fulton County case against Defendant was dismissed on November 1, 2017. [Dismissal Order]. The federal indictment against Defendant was not filed until September 18, 2018, almost one year later. [Doc. 1]. The prosecutions did not overlap. Defendant has not shown that there is privity between the United States Attorney's Office for the Northern District of Georgia and the Fulton County District Attorney's Office - the only two sovereigns with authority to bring and prosecute charges against Defendant Lewis.

For these reasons, the court finds that the doctrine of collateral estoppel or issue preclusion does not bar the Government from using evidence obtained during the stop of the Suburban and detention of Defendant Lewis at his federal trial.

### 5.    Conclusion

For all of the foregoing reasons and cited authority, the court **RECOMMENDS** that Defendant's motions [Docs. 19, 20 and 25] be **DENIED**.

68

## II.   Bill of Particulars

Defendant filed a corrected motion [Doc. 28] for a bill of particulars on February 26, 2019.   The Government has responded opposing the motion.   [Doc. 30].[43] Defendant seeks the following information, with respect to the drug conspiracy charge [Doc. 43 (Superseding Indictment), Count 1]:  the earliest statements and/or events and all subsequent statements and/or events to be used to prove the conspiracy existed and all statements and/or events to prove when Defendant and other defendants joined the conspiracy.   And, with respect to the possession with intent to distribute charge [Id., Count 2], he requests:  any and all statements and events to be used to prove Warren Ferguson and Tyler Owens, or any other known or unknown defendants, aided and abetted Defendant.  [Doc. 28].  The Government objects to Defendant's requests noting that Defendant has received extensive discovery materials and arguing that he is seeking evidentiary detail that exceeds the scope of a bill of particulars.  [Doc. 30]. The Government is correct.

---

[43]As a part of the objection to the bill of particulars, the Government asserts that both the original motion for a bill of particulars [Doc. 27] (which has been denied as moot [Docket Entry dated March 19, 2019]) and the corrected motion are untimely and should be denied for that reason.  [Doc. 30 at 3 n.1].  Although the Government's contention is valid, the court declines to deny the corrected motion as untimely and will consider Defendant's bill of particulars on the merits.

AO 72A
(Rev.8/82)

### 1.     Superseding Indictment

The superseding indictment, filed on July 23, 2019, alleges in Count 1 that, within the Northern District of Georgia, beginning on a date unknown, but at least as of August 20, 2015, and continuing through December 14, 2015, Defendant conspired with Warren Ferguson and Tyler Owens to violate 21 U.S.C. § 841(a), that is, to knowingly and intentionally possess with the intent to distribute a controlled substance, at least five kilograms of cocaine, all in violation of 21 U.S.C. § 846.  In Count 2, it is alleged that, within the Northern District of Georgia, on or about December 14, 2015, Defendant knowingly and intentionally possessed with the intent to distribute a controlled substance, at least five kilograms of cocaine, all in violation of 21 U.S.C. § 841(a).  [Superseding Indictment].[44]

### 2.     Discussion

"The purpose of a bill of particulars is to inform the defendant of the charge against him with sufficient precision to allow him to prepare his defense, to minimize surprise at trial, and to enable him to plead double jeopardy in the event of a later prosecution for the same offense."  United States v. Warren, 772 F.2d 827, 837 (11th

---

[44]The superseding indictment also provides a prior conviction notice and a request for forfeiture.  [Id.].

Cir. 1985); see also United States v. Hassoun, 477 F. Supp. 2d 1210, 1227-28 (S.D. Fla. 2007) ("A request for bill of particulars is, *inter alia*, befitting in those instances where defendant seeks further clarity and precision with regard to the charges that he is facing in order to adequately prepare a defense."). "Generalized discovery is not the proper function of a bill of particulars." Warren, 772 F.2d at 837 (citing United States v. Colson, 662 F.2d 1389, 1391 (11th Cir. 1981)); see also United States v. Roberts, 174 Fed. Appx. 475, 477 (11th Cir. 2006) (same). While the court "is vested with broad discretion in deciding whether a bill of particulars should be granted[,]" United States v. Cole, 755 F.2d 748, 760 (11th Cir. 1985), "'where an indictment fails to set forth specific facts in support of requisite elements of the charged offense, and the information is essential to the defense, failure to grant a request . . . may constitute reversible error[,]'" Id. (quoting United States v. Crippen, 579 F.2d 340, 349 (5th Cir. 1978)).

As set forth *supra*, Counts 1 and 2 of the superseding indictment state the essential elements of each charged offense. To the extent that Defendant seeks details as to dates, times, locations, statements and actions undertaken, either by him or one or more co-conspirators, in furtherance of the conspiracy, his requests exceed the proper scope of a bill of particulars. Defendant is not entitled to an accounting of the

71

"overt acts" he committed in furtherance of the charged drug conspiracy. Overt acts are not elements of the offense, and the Government is not required to prove that Defendant committed such an act in order to obtain a conviction. See United States v. Shabani, 115 S. Ct. 382, 386 (1994) ("proof of an overt act is not required to establish a violation of 21 U.S.C. § 846"). Additionally, "[c]ase law is also clear that the Government is not required to identify the exact dates or details of when a defendant or any conspirator joined or withdrew from a charged conspiracy, . . . or specific acts or overt acts done in furtherance of a charged conspiracy by particular defendants[.]" United States v. Leiva-Portillo, 2007 WL 1706351, at *15 (N.D. Ga. June 12, 2007) (citing, inter alia, United States v. Rosenthal, 793 F.2d 1214, 1227 (11th Cir. 1986)); and see United States v. Abdi, 2014 WL 3828165, at *8 (N.D. Ga. August 4, 2014) ("'As applied to a charge of conspiracy, . . . the view virtually universally held is that the defendant is not entitled to particulars regarding the formation of the conspiracy; [the] exact time and place of overt acts and the names and addresses of persons present; the details concerning how and when the conspiracy was formed or when each participant entered the conspiracy.'") (citation omitted); United States v. Wilson, 2013 WL 820726, at *2 (S.D. Ala. March 5, 2013) ("'[a] bill of particulars may not be used to compel the government to provide the essential facts regarding the

72

existence and formation of a conspiracy[; n]or is the government required to provide defendants with all overt acts that might be proven at trial'") (quoting <u>Rosenthal</u>, 793 F.2d at 1227). And with respect to Count 2, Defendant seeks details regarding the individuals who allegedly aided and abetted him in possessing with intent to distribute the cocaine on December 14, 2015. [Doc. 28]. However, the superseding indictment does not allege that Defendant was aided and abetted by anyone. [Superseding Indictment, Count 2].

Additionally, the conspiracy count and the substantive count both sufficiently provide the date(s) for the alleged criminal activity. "The date and time of an offense are not essential elements." <u>United States v. McGowan</u>, 2014 WL 1513265, at *5 n.6 (N.D. Ala. April 16, 2014) (citing, *inter alia*, <u>United States v. Reed</u>, 887 F.2d 1398, 1403 (11th Cir. 1989) ("When the government charges that an offense occurred 'on or about' a certain date, the defendant is on notice that the charge is not limited to the specific date or dates set out in the indictment."). As stated *supra*, the Government is not required to provide details regarding when a conspiracy was formed and/or when Defendant or any other participant joined the charged conspiracies. <u>See</u> <u>Abdi</u>, 2014 WL 3828165, at *8; <u>Leiva-Portillo</u>, 2007 WL 1706351, at *15. And it is well settled that an indictment adequately advises a defendant of the location or place of the

73

offense if it specifies the district in which the offense occurs.  See United States v. Champion, 813 F.2d 1154, 1168 (11th Cir. 1987) (indictment alleging district where offense occurred sufficiently informs defendant of the place of offense); United States v. Harrell, 737 F.2d 971, 975 n.4 (11th Cir. 1984) (charge that offense occurred within specified district is adequate); United States v. Bonner, 2008 WL 793763, at *1 (S.D. Ala. March 20, 2008) (finding that "indictment's statement that the offense occurred in the Southern District of Alabama . . . provides sufficient notice to the defendant of the place the offense occurred").

Otherwise, Defendant simply is not entitled to the evidentiary detail he seeks. See Roberts, 174 Fed. Appx. at 477 (a bill of particulars "'is not designed to compel the government to detailed exposition of its evidence'") (citation omitted); United States v. Scrushy, 2004 WL 483264, at *9 n.5 (N.D. Ala. March 3, 2004) ("[T]here is a difference between being surprised by the charge and being surprised by the evidence supporting a charge.  The function of the bill of particulars is to reduce surprise at the charge, that is, to enable the defendant to identify what he is alleged to have done in violation of law.  It is not to eliminate surprise with respect to evidence offered in support of a charge that is clearly understood by the defendant.") (emphasis in original); United States v. Giffen, 379 F. Supp. 2d 337, 346 (S.D. N.Y. 2004) ("The

74

ultimate test in deciding whether a bill of particulars should be ordered is whether the information sought is necessary, as opposed to helpful, in preparing a defense.").

The court notes that the fact discovery materials are provided to Defendant is an appropriate factor to consider in deciding whether a bill of particulars is warranted. See Roberts, 174 Fed. Appx. at 477 ("A bill of particulars is not required where the information sought has already been provided by other sources, such as the indictment and discovery. . . ."); United States v. Al-Arian, 308 F. Supp. 2d 1322, 1359 (M.D. Fla. 2004) ("However, a bill of particulars is not typically warranted in so far as it seeks information already available through other sources.") (citing Rosenthal, 793 F.2d at 1227 ("Nor is the defendant entitled to a bill of particulars with respect to information which is already available through other sources such as the indictment or discovery and inspection.")); see also United States v. Kunzman, 54 F.3d 1522, 1526 (10th Cir. 1995) (bill of particulars is not necessary when indictment is sufficiently specific and the defendant has access to the government's file); United States v. Caputo, 288 F. Supp. 2d 923, 925 (N.D. Ill. 2003) (same); United States v. Cooper, 283 F. Supp. 2d 1215 (D. Kan. 2003) (same). As the Government outlines, Defendant was provided with a wealth of information in discovery, including investigative reports, audio and video recordings, and the statements of co-defendants providing information about

75

Defendant's conduct.  [Doc. 30 at 4-5].  And the testimony at the evidentiary hearing on Defendant's motions to suppress provided additional details about the conspiracy and about the events on December 14, 2015.

Furthermore, as is evident from the materials produced in discovery and the nature of the charges in this case, in large part, Defendant seeks the details about the acts in which *he* engaged in commission of the charged offenses.  It is doubtful that Defendant could establish that, without the Government providing the details about this evidence, he was not able to prepare a defense to the charged offenses or was surprised.  In a case where the evidence being sought by a bill of particulars consists of activities in which a defendant participated or witnessed, the defendant "'could hardly have been surprised by the government's proof at trial.'"  United States v. Cantu, 557 F.2d 1173, 1178 (5th Cir. 1977) (quoting United States v. Pena, 542 F.2d 292, 293-94 (5th Cir. 1976)); see also United States v. Williams, 113 F.R.D. 177, 179 (M.D. Fla. 1986) (When the information sought involves "events in which one or more of the defendants participated, or which occurred in one or more of the defendants' presence[, t]he Eleventh Circuit has held that this sort of information need not be furnished in a bill of particulars.") (citations omitted).

76

For these reasons, the court **DENIES** Defendant's motion [Doc. 28] for a bill of particulars.

## III.    Conclusion

Based on the foregoing cited authority and for the reasons stated, the court **RECOMMENDS** that Defendant's motions [Docs. 19, 20 and 25] to suppress evidence and statements be **DENIED** and **ORDERS** that Defendant's motion [Doc. 28] for a bill of particulars be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, declared Ready for Trial.

**SO ORDERED AND RECOMMENDED** this 1st day of October, 2019.


JANET F. KING
UNITED STATES MAGISTRATE JUDGE

77

AO 72A
(Rev.8/82)